1926.] Ulmer et al. v. Portgage Construction Co. et al.

## PURCHASE MONEY CLAIM, MORTGAGES AND LIENS OF MATERIALMEN AND MECHANICS.

Common Pleas Court of Summit County.

JACOB M. ULMER and JOSEPH M. BERNE, Doing Business as ULMER & BERNE, *vs* THE PORTAGE CONSTRUCTION & FINANCE COMPANY, THE CLEVELAND DISCOUNT COMPANY ET AL. *

Decided December, 1923.

*Liens—Legality of—Extent to Which Corporations, Acting as Building Contractors, may Acquire Real Estate—Such Purchases Ultra Vires, When—Borrowings Greatly in Excess of Capital Stock—Situation of the Vendor Holding a Purchase Money Claim—And of the Lender of Large Sums for Construction Purposes in Ignorance of Ultra Vires Acts—And of Other Creditors of Different Classes Whose Liens Accrued at Various Stages of the Work—Contracting Painters and Carpenters not Laborers and Must Furnish Verified Statements—Effect of Payment by Contractor of Claims Against Him in Full—Defective and Ineffective Liens—Right of Adverse Lienor to Assert Invalidity of Lien—Effect of Entrance of a Receiver of the Owning Corporation During the Construction Period—Time for Filing Sworn Statements and Certificates—What Constitutes a General Contract—Separate Contracts for Different Buildings Located on same Site—Material Furnished under an Indefinite Agreement, but in Expectation that More will be Ordered— During Interval Mortgages are Filed—Judicial Construction of the Builders Construction Mortgage Law—Determination of Priorities—Sections 8627, 8312, 8315, 8316, and 8321-1.*

1. An Ohio corporation, organized for the purpose of carrying on a construction contracting business, that is the building of structures for others as a contractor, has the right, under G. C., Sec. 8627, to acquire such real property as is reasonably necessary and useful in carrying on the business for which it is incorporated.

2. The purchase of a tract of real estate by such corporation, for the purpose of erecting thereon three apartment buildings, the

---

* Affirmed by the Court of Appeals without report, June 4, 1925. Motion to certify record overruled by the Supreme Court, March 23, 1926, under the titles of Herberich Realty Co. vs Rogers, Recr.; Ram et al. vs Rogers, Recr., and Rogers, Recr., vs Abbott et al., **Recrs.**

**258    SUMMIT COUNTY COMMON PLEAS.**

Ulmer et al. v. Portage Construction Co. et al. [Vol. 26 (N.S.)

deed received limiting the use of the land to that purpose, is. *ultra vires.*

3. When the vendor of such tract of land brings an action against such corporation to enforce payment of the balance of the purchase price and it appears that the contract of purchase has been fully performed by the vendor and nothing remains to be done by the vendee except payment of the balance due, and it appears further that such corporation has made conveyances of said premises, by mortgage deed, the conditions of which have been broken by it, and that it has contracted with others in such a way as to encumber the title to said real estate, neither said corporation nor its receiver will be permitted to set up its usurpation of authority in purchasing said real estate to defeat the claim of the vendor for the unpaid part of the purchase price.

4. Such corporation may borrow money to carry on its business, in an amount not exceeding its capital stock. The act of such corporation in borrowing $870,000 for the purpose of constructing three apartment buildings on a tract of real estate purchased by it for that purpose, at a time when its capital stock is $50,000, is in excess of its power and *ultra vires.*

5. When the lender brings an action to enforce payment of the money loaned to the corporation, and it appears that the contract has been executed by the lender, and that, to secure the payment of the amount loaned, conveyances of its real estate were made by the corporation, by mortgage deeds, and that the conditions of said mortgage deeds have been broken, and nothing remains to be done but the payment of the amount due the lender, and it does not appear that the lender knew, at the time, that such borrowing was *ultra vires* the corporation, neither such corporation nor its receiver will be permitted to set up such usurpation of authority by it to defeat the action of the lender.

6. In such case, a creditor of such corporation who has not shown himself damaged by such *ultra vires* borrowing cannot set it up to defeat the action of the lender to recover the amount due him.

7. One who contracts to do all of the painting on a building, including the furnishing of the necessary labor and material, for a stipulated price, is a contractor and not a laborer. Being a contractor, he must furnish to the owner the verified statements, accompanied by certificates, as provided for in G. C., Sec. 8312, in order that he may have a lien.

8. The fact that his laborers and material men have been paid in full does not relieve him from furnishing such statement. Such requirement of the statute is mandatory.

9. One who contracts to furnish and perform all the carpenter labor in the erection of a certain building, for a stipulated price, and who, thereafter, employs laborers and performs his contract, is a contractor and not a laborer. Being a contractor, he must furnish to the owner the verified statements, accompanied by certificates as provided in G. C., Sec. 8312, in order that he may have a lien.

10. The furnishing of such statement to the owner is indispensable, notwithstanding the owner and the contractor may be the only parties interested.

11. An adverse lienor is entitled to assert the invalidity of a lien because of a failure to serve upon the owner the proper statements required by G. C., Sec. 8312.

12. An affidavit for a lien, filed with the county recorder, which fails to state either the date when the last labor was performed or material furnished, or that the same was performed or furnished within sixty days, is ineffective to perfect a lien.

13. The lien claimant may not be permitted to supply such deficiency in his affidavit by parol.

14. When a receiver is appointed for the property of a corporation, while a contractor is engaged in the performance of a building contract with the corporation, the sixty day period within which the contractor must file his affidavit for a lien does not necessarily begin to run from the date when the receiver is appointed. In such case, the contractor has a reasonable time under the circumstances to ascertain what may be done by the parties in interest with respect to the completion of the work.

15. An affidavit for a lien which recites that the agent of the claimant was first duly sworn, and which has attached a notary's certificate, stating: "Sworn to and subscribed before me," is *prima facie* sufficient in the absence of any contradicting testimony, even though the affidavit does not appear to be subscribed by the agent of the claimant, but instead has subscribed to it the name of the corporation, by agent.

16. Where service of a copy of an affidavit for a mechanic's lien is made on the owner a day or two before the original is filed with the county recorder, it is a substantial compliance with G. C., Sec. 8315, providing that the copy must be served within thirty days after filing.

17. Where the proper sworn statements, accompanied by certificates, as required by G. C., Sec. 8312, are furnished to the owner a day or two days after the affidavit for a lien is filed with the recorder, but within the sixty day period within which the affidavit may be filed, it is a sufficient compliance with the statute, for the purpose of perfecting the lien.

18. G. C., Sec. 8316, defines the conditions under which but one affidavit for a lien need be filed in case two or more buildings are being erected or improvements made. In any case, the buildings must be erected or the improvements made under one general contract. A general contract under this statute is one that is not confined to a single or definite building, but relates to all the buildings.

19. Where one enters into a contract with the owner on April 6, 1920, to do the plumbing and heating of one building, and on May 3, 1920, he enters into another contract to do the plumbing and heating of a second building, and on September 2, 1920, he enters into another contract to do the plumbing and heating of a third building, and all of the buildings are located on a single tract, it is necessary to file three affidavits for liens, because the work was done under three separate contracts. In such case, no lien is perfected by the filing of one affidavit, because the work was not done under one general contract.

20. The words, "erected under one general contract," as used in G. C., Sec. 8316, are not to be confined to a case where the owner may contract for the erection of the buildings in one general contract. They apply, as well, to a case where the owner erects his own buildings and enters into contracts for some portion of the work, as where he may let one contract for all the work and material. They also apply to a material man who enters into a general contract to furnish material for all the buildings.

21. Where the owner informed the material man that he wished to erect three buildings on a certain tract of land; that he wanted prices and a contract for material, and the material man began to furnish material for the erection of the buildings, without any agreement as to the amount of the material or the duration of his employment, but under a reasonable expectation and belief, induced by the owner, that further material would be ordered of him, to construct the buildings, and he is afterward called upon from time to time, to furnish material, until the buildings are completed, in such situation, the material man is furnishing material under one general contract, within the terms of G. C., Sec. 8316, and he is entitled to a lien, as though acting under a complete original general contract, for the entire amount of the material so furnished.

22. In such case, mortgages were filed for record while the material man was furnishing material. The mortgages complied with the requirements of G. C., Sec. 8321-1, in that they contained the correct name and address of the mortgagees, together with the covenant between the mortgagor and mortgagees, authorizing and empowering the mortgagee to do all things in said

act provided by said mortgagee to be done, and were filed after the improvement was begun. The lien of such mortgages will be superior to the lien of the material man only to the extent that the proceeds are used and applied for the purposes stated in the act, and pursuant to its provisions. The lien of such mortgages, to the extent that the proceeds have been paid otherwise, will be inferior to that of the material man.

23. In such case, the lien of the material man attaches to the interest of the owner in the entire tract at the time he furnishes the first material on the job, for the whole amount of his claim, subject, only, to his completing the furnishing of the material according to his agreement, and to his taking the necessary steps to perfect his lien. The fact that at a later time and while material was being furnished, the owner gave three mortgages on the tract, divided into three parcels, the object and purpose of such mortgages known to both the mortgagor and the mortgagee being to provide the money for the erection of the three buildings, does not operate to compel the material man to split his claim and file three affidavits for lien. Especially is this the case when the material man was at no time notified of the division of the tract and at no time asked to keep a separate account of the material furnished for the three buildings.

24. In such case, the fact that, when the mortgages were recorded, two of the three buildings had not been actually begun, is immaterial so far as the material man's right to a lien is concerned, his lien having already attached.

25. The purpose of G. C., Sec. 8321-1, commonly known as the construction mortgage law, is to provide a way by which money may be borrowed and a mortgage given to complete a building or improvement after it has been begun. It does not create any new rights or remedies in favor of contractors and sub-contractors. Neither does it make the money loaned, a trust fund for their payment. It does not provide for the payment of any money to them, by the mortgagee, during the course of construction, nor at its completion. Upon completion, the statute disposes of the balance in the following language: "Such mortgagee shall pay the balance, if any, in said mortgage fund, after said improvement is completed, to the owner, or to whomsoever he may direct."

26. The only right which the law gives laborers and material men to the money in the hands of the mortgagee are those set forth in sub-sections 4, 5 and 6, and such rights become operative only on the happening of the events provided for in said subsections.

27. Under sub-section 2 of the act, the mortgagee is authorized at any time to withhold sufficient funds to complete the improvement according to the original plans, specifications and contracts and within the original contract price. But he is not required to do so, except in one situation, and that is that laborers and material men have filed written notices with him, as provided in sub-section 4. If laborers and material men do file such written notices with him, then and then only must he retain sufficient funds to complete the improvement before making any payments to laborers and material men.

28. The H. R. Company contracts to sell to the P. C. Company a tract of land, receives part of the purchase price and gives possession to the P. C. Company. The P. C. Company then contracts with the B. G. Company for material for the erection of three buildings on said land and the B. G. Company delivers a part of the material. Later, the H. R. Company conveys the tract by deed to the P. C. Company and takes a mortgage back for the unpaid part of the purchase price. On the same date, the P. C. Company gives three mortgages on the tract, divided into three parts, numbered 1, 2 and 3, to the C. D. Company. By agreement, the mortgages of the C. D. Company, as well as two others executed and delivered at a later date, are made prior liens to that of the H. R. Company. The lien of the H. R. Company is superior to that of the B. G. Company to the extent of the unpaid part of the purchase price, and to that extent, only. The lien of the B. G. Company attaches to the interest of the vendee, only, the P. C. Company. This interest is the value of the tract conveyed, including the value of the improvments placed on it by the P. C. Company, less the unpaid part of the purchase price.

29. If the property be sold at judicial sale and the proceeds are insufficient to pay all of the liens in full after the payment of the costs, taxes and assessments, if any, and the receiver's certificates issued by order of the court to complete the improvements on Parcels 2 and 3, the following order of distribution will be observed: First: The amount due the H. R. Company will be set aside. Second: The lien of the B. G. Company shall be paid in full. Third: The remainder shall be applied to the mortgages on the three parcels which by agreement are prior to the lien of the H. R. Company. Fourth: If the remainder be insufficient to pay said mortgage liens in full, then the amount set aside as due the H. R. Company shall be applied to the payment of said mortgages.

*J. M. Berne, E. O. Peck,* and *Robert Guinther,* counsel for the plaintiffs and for the defendants Cleveland Discount Co., the Midland Bank, Charles J. Forbes, Trustee, and for George W. Rogers, receiver of the Portage Construction & Finance Company.

*Roy H. Nesbitt, Wendel L. Willkie, Amos H. Englebeck, Gordon Davies, Fred Lahrmer, Perry Stevens, I. T. Siddall, Frank H. Watters, Dudley E. Maxon, Ben W. Holub, Bernard W. Amer, Edmund Burroughs, Ralph Burroughs, Carl M. Myers, Simmons, DeWitt & Vilas, G. H. Doolittle, Mason Snow, Fairall & Fairall, G. C. Walker, William D. Pence, Don Hotchkiss, W. J. Laub, M. C. Beckerman* and *A. S. Mottinger,* counsel for the many defendants.

### STATEMENT OF FACTS.

FRITCH, J.

On the 11th day of August, 1921, the plaintiffs, Jacob Ulmer and Joseph M. Berne, began their action in this case against the Portage Construction & Finance Company and the Cleveland Discount Company, on a judgment in favor of the plaintiffs, in the sum of $2,503.33, against the Portage Construction Company. The action is for the marshalling of liens and the sale of the six parcels of real estate described in the petition, and for the appointment of a receiver for the property of the Portage Construction & Finance Company, and for the equitable relief. The first three parcels of real estate described in the petition make up the tract on which are located the Twin Oaks, Pasadena and Mayfield Apartments. Receivers were appointed, the Cleveland Discount Company and the Portage Construction & Finance Company consenting.

The three apartment buildings above named had not been completed when this action was begun. On May 29, 1922, the receivers were authorized to complete the buildings and issue receiver's certificates for the cost, which was done.

The defendant, the Herberich Realty Company, claims

a mortgage on the first three parcels of real estate described in the petition. The Cleveland Discount Company, by William L. David and Gardner Abbott its receivers, the Midland Bank, Trustee, and Charles J. Forbes, Trustee, claim by way of mortgages on property described in the petition. The defendant, Kelly Weiss, and the plaintiffs, claim judgment liens. The remainder of the defendants claim mechanic's liens, either as contractors, material men or sub-contractors.

The following defendants assigned their claims to the Cleveland Discount Company, before final submission, namely: the Hardware & Supply Company, the Builders Supply Company, the U. N. D. Electric Company, Fred Wilhelm, W. E. Vale, M. C. Smith, the Mill & Mine Supply Company, the Portage Mosaic & Tile Company, the Akron Storage & Contracting Company, Bentz Brothers, the Murphy Door Bed Company, the Enameled Steel Products Company, the Robbins Manufacturing Company, the Enterprise Electric Company and Lee Kanaga.

Charles Thompson offered no evidence in support of his claim.

The defendants, George Herbruck, Sigmund Braverman, Harry Ettinger, doing business as National Cornice & Ceiling Company, Jud Yoho and E. Hooker, doing business as Yoho & Hooker, and the Refrigerating & Ventilating Engineering Company did not file answers or cross-petitions.

The Portage Construction Company was organized February 19, 1917. Its authorized capital was One Thousand Dollars. Its corporate purpose was "engaging in the general contract business, in the city of Akron, Ohio, and vicinity."

In August, 1919, by the action of its stockholders, officers and directors, the authorized capital stock was changed to $50,000, and the additional stock ordered sold.

In April, 1921, its charter was amended, so as to make its authorized capital stock $350,000. Its name was changed to the Portage Construction & Finance Company. Its purpose clause was changed to read as follows: "Said

corporation is formed for the purpose of leasing, purchasing or otherwise acquiring and owning, selling, exchanging, leasing, mortgaging, improving, developing, and otherwise handling, dealing in and disposing of real estate, real property, and any interest or right therein, constructing and erecting buildings, and doing general contracting and construction work of every kind, and acquiring, owning, disposing of and dealing in real estate mortgages, notes and bonds, purchasing, selling and dealing in real and personal property, making and negotiating loans on real estate for itself and as agents for others, and the transaction of any and all business incidentally or necessarily connected with same or any or all of the foregoing provisions, and is to exist for the term of 25 years."

These amendments were adopted by the unanimous vote of the stockholders, and the state has made no objection.

Under date of February 14, 1920, it appears in the corporate records of the Portage Construction Company, that Mr. Miller, its president, reported that he had negotiated with Mr. Charles Herberich, with reference to the purchase of the tract of land located on Twin Oaks Road, and that the terms "laid down" by the Portage Construction Company, at their last board meeting, were acceptable to Mr. Herberich, and further, that he had entered into a sales agreement, upon the terms and conditions "laid down" at the last meeting. A resolution was also passed, authorizing the president and secretary to sign and execute, on behalf of the company, notes and all other documents necessary to the proper execution of the purchase of this real estate.

The intent and purpose of the company, at that time, is expressed in a preamble to another resolution, in the following language: "And Whereas, it is the intent and purpose that this land be used for the erection of three large apartment buildings."

In the record of the meeting of the directors of the Portage Construction Company, on May 1, 1920, there appears

a recital preceding a resolution, in the following language: "Whereas, the Company is now erecting three apartment buildings, on Twin Oaks Road and North Portage Path." In the same record, on the same date, these apartments are referred to as "our Twin Oaks apartments."

On the 16th day of January, 1920, the Herberich Realty Company entered into a contract with the Portage Construction Company, to sell to it the east 170 feet of its land on Twin Oaks Road, now occupied by the Twin Oaks apartment, for $28,000. The contract contains numerous restrictions and limits the use of the land for an apartment or residence, to cost not less than $50,000. The Herberich Realty Company also agreed after the erection of the building to take a second mortgage for the balance due it, under the conditions set out in the contract, but these conditions were not followed.

As early as February 14th, according to its record book, the Portage Construction Company had already contracted with the Herberich Realty Company for the remainder of the tract on Twin Oaks Road, and had already expressed its intention to construct there three large apartment buildings.

On the 30th day of April, 1920, Charles Herberich and wife executed a warranty deed to the Portage Construction Company, conveying to it their land on Twin Oaks Road, being the 470 feet now occupied by the Twin Oaks, Pasadena and Mayfield buildings. The deed contains many conditions, restrictions and limitations as to its use and development. This deed was filed for record on May 10, 1920, at 10:30 a. m. This deed limits the use of the premises to three apartment buildings.

On the third day of May, 1920, the Portage Construction Company executed a note for $54,940 and a mortgage, securing the note, to the Herberich Realty Company, on the 470 feet described in the deed from Charles Herberich and wife to the Portage Construction Company. The mortgage states: "That the same are free from all incum-

brances whatsoever except first mortgages in the sum of $900,000 to the Cleveland Discount Company." This mortgage was not filed for record by the Herberich Realty Company until May 20, 1920, at 3:40 p. m., pursuant to the understanding and agreement with the Cleveland Discount Company that the mortgage of the Herberich Realty Company should be second to those of the Cleveland Discount Company.

On May 10, 1920, the Portage Construction Company executed and delivered its notes and mortgages to the Cleveland Discount Company, conveying to it the same real estate described in the deed from Charles Herberich and wife to the Portage Construction Company, dated April 30, 1920, but divided into three parcels, which are described in the plaintiff's petition as parcels one, two and three, and being respectively the parcels on which Twin Oaks, Pasadena and Mayfield apartments were constructed, the mortgage on Parcel Number One being for $335,000; on Parcel Number Two, for $200,000; and on Parcel Number Three, for $335,000.

These three mortgages were filed for record the same day, making these three the first mortgages on the premises, and that of the Herberich Realty Company, the second, on the record of mortgages.

On the 14th day of June, 1921, the Portage Construction & Finance Company conveyed Parcel Number One to Charles J. Forbes, as Trustee, by a mortgage deed, to secure a bond issue of $250,000. Said mortgage was filed for record, May 25, 1921, at 12:30 p. m.

On June 3d, 1921, the Cleveland Discount Company waived the priority of its mortgage for $335,000 on Parcel Number One, in favor of the mortgage of $250,000 to Charles J. Forbes, Trustee, said waiver being recorded June 10, 1921, and the declared intention in the waiver being to make the mortgage to Charles J. Forbes, Trustee, the first lien on the property.

On the 14th day of May, 1921, the Portage Construc-

tion & Finance Company conveyed Parcel Number One to the Cleveland Discount Company, by mortgage deed, to secure the payment of $185,566.67, subject to the mortgage of $250,000 to Charles J. Forbes, Trustee. Said mortgage was recorded June 10, 1921, at 11:30 a. m.

On June 8, 1921, the Cleveland Discount Company waived the priority of its said mortgage for $335,000 on Parcel Number One, in favor of the mortgage executed to it by the Portage Construction & Finance Company, in the sum of $185,567.67. Said waiver was recorded June 10, 1921.

On June 8, 1921, the Cleveland Discount Company waived the priority of its mortgage for $335,000 on Parcel Number One, in favor of a mortgage executed by the Portage Construction & Finance Company to the Herberich Realty Company, in the sum of $54,490, dated May 3, 1920, and recorded May 20, 1920. Said waiver was recorded June 10, 1921.

On June 10, 1921, the Herberich Realty Company waived the priority of its mortgage of $54,490, in favor of the mortgage for $250,000 to Charles J. Forbes, Trustee, and also in favor of the mortgage for $185,567.67, to the Cleveland Discount Company. The declared intention of the waiver is stated in the following language:

"The intention being to make the aforesaid mortgage or deed of trust to Charles J. Forbes, Trustee, the first and best lien on the premises mortgaged and conveyed in the said deed of trust to Charles J. Forbes, Trustee, and the mortgage of $185,567.67, executed to the Cleveland Discount Company, a second best lien upon said premises, and leaving the within mortgage to the Herberich Realty Company a third best lien on said premises."

On the fifth day of July, 1921, the Cleveland Discount Company assigned its notes and mortgage of $335,000 on Parcel Number Three to Charles J. Forbes, Trustee.

On June 11, 1923, said Charles J. Forbes, Trustee, assigned said mortgage and the notes secured by it to

the Guardian Savings & Trust Company, of Cleveland, Ohio, as his said successor as Trustee.

On July 30, 1923, the Guardian Savings & Trust Company, as such Trustee, assigned said mortgage, and the notes secured by it, to the Midland Bank, as Trustee.

The foregoing states the facts in relation to the conveyance of Parcels Number One, Two and Three.

On the 16th day of April, 1920, Louis Miller and wife executed and delivered to one Harry Slosower their promissory note for $90,000, secured by a mortgage of that date. After a number of assignments, said note and mortgage are now held by the Midland Bank, Trustee.

On the 9th day of September, 1920, the Portage Construction & Finance Company executed and delivered to the Cleveland Discount Company its note and mortgage for $30,000, on the real estate described in the petition as Parcel Number Six.

On the 13th day of October, 1920, the Portage Construction Company executed and delivered to the Cleveland Discount Company its promissory note, for $60,000, and a mortgage securing said note, on the real estate described in the petition as Parcel Number Four.

After the receivers of the Portage Construction & Finance Company were authorized to complete the Pasadena and Mayfield buildings, they borrowed, at various times thereafter, from the Cleveland Discount Company, on receivers' certificates, the sum of $95,000, as set forth in the third cause of action in the cross-petition of William L. David and Gardner Abbott, as receivers of the Cleveland Discount Company. None of said certificates have been paid. Said receivers claim a first lien on Parcels Number Two and Number Three, to secure the payment of said certificates, by virtue of the order made by the court in authorizing the borrowing of the money.

After the purchase of Parcel Number One, in January, 1920, the Portage Construction Company began the construction of the Twin Oaks building. Within the first half

270    SUMMIT COUNTY COMMON PLEAS.

Ulmer et al. v. Portage Construction Co. et al. [Vol. 26 (N.S.)

of the year 1920, it purchased materials and entered into contracts for the doing of various kinds of construction work on all of the buildings, namely: Twin Oaks, Pasadena and Mayfield. The construction of the buildings was then carried forward, more materials were purchased and more contracts entered into, up to about the time the receivers were appointed for the Portage Construction & Finance Company, in August, 1921.

Any further statement of facts necessary will be made in connection with the various claims, as they are separately considered.

## Ultra Vires.

It must be conceded that the difficulties connected with the doctrine of *ultra vires* arise in its application to particular sets of circumstances. No Ohio case involving in all respects essentially the same facts has been found by counsel. The application of the doctrine to the facts of this case must be determined on principle, rather than on exact precedent, and for that purpose, the court will limit its consideration to those cases in which there is a discussion of the questions arising in this case.

## Claims.

*Number One—*

The first claim is made by the receiver of the Portage Construction & Finance Company, and is, in effect, that the purchase of the real estate described in the mortgages to the Cleveland Discount Company was and is *ultra vires* and void. It is not claimed that the Portage Construction Company could under no circumstances purchase real property, but that the object and purpose of its purchase in this case rendered it *ultra vires* and void. In considering this claim, the court will first confine itself to those cases involving the power of a corporation to acquire property by purchase.

Under General Code, Section 8627, it is obvious that it could acquire real estate necessary to effect the object for which it was created. So that we do not have the same question that would be presented in the case of a corporation that had no power to acquire real estate or was specifically forbidden to do so.

The case of *Railway Co.* v. *Iron Co.*, 46 O. S., 44, was a case of an executory contract of the Iron Company for the purchase of stock in the Railway Company. The action was for goods sold and delivered, but the parties were relegated to their stock contract. The court found that the corporation had no power whatever to subscribe for stock in another corporation, and that the contract was accordingly void. The court quotes, with approval, from Morawitz on Private Corporations, to the effect that the right to form a corporation by subscribing for its stock is conferred by law only on natural persons, acting individually, and not on associations.

This case is to be distinguished from the case at bar, on two grounds, namely; the agreement to purchase stock was executory, and the corporation had no power whatever, either expressly or by implication, to purchase any corporation stock.

The case of *Ehrman* v. *Insurance Company*, 35 O. S., page 324, involved the unauthorized purchase of personal property by a corporation. The contract of purchase was an executed one. Power to purchase personal property, as well as real property, is controlled by the same General Code Section, namely 8627. On page 337 of the opinion, where a discussion is had of the power to purchase property, the court uses the following language:

"In applying the doctrine of *ultra vires* in a particular case, regard must be had not only to the unauthorized agreement or transaction, but also to the relation which the litigating parties sustained to it. Where there is an absolute or a total want of power in a corporation to deal in respect to a given subject, it may be that acts done in the name of the corporation, in regard to such subjects,

would, as corporate acts, be void for all purposes and as against all persons. But there is an obvious distinction between such a case and one where the corporation deals with a subject within the scope of its granted powers, but for a purpose or in a mode not authorized by its charter. Thus, where a property, which the corporation, under certain circumstances, is authorized by its charter to acquire, is purchased in a mode or for a purpose not authorized, it seems clear to us that the title of the corporation to the property cannot be defeated by a party who is a stranger to the agreement by which the property was acquired, and who is not injured by the transfer."

The case of *The Central Natural Gas & Fuel Company* v. *The Capital City Dairy Company,* 60 Ohio State, page 96, involved the unauthorized purchase of personal property, in which the contract of purchase was executed. On page 106 of the opinion, the court uses the following language:

"The proper application of the doctrine of *ultra vires* depends largely on the relation of the parties to the litigation. When the action of a corporation is challenged by the sovereignty which gave it existence, or by whose favor it is permitted to pursue its business, it may be required to show a clear warrant for the acts so called in question. While in suits between individuals and corporations, or between corporate bodies, where private rights, only, are involved, the rule is not inflexible and yields to considerations of right and justice. In suits of that kind, it is maintained by the highest authority that the title of a corporation to real or personal property cannot be assailed, nor its enjoyment defeated, on the ground that its acquisition was in excess of the corporate power or in a mode not conformable thereto."

"This is held in *Bank* v. *Matthews,* 98 U. S., 621, where it is said by Mr. Justice Swayne, that:

"Where a corporation is incompetent to take title to real estate, a conveyance to it is not void, but only voidable, and the sovereign, alone, can object. It is valid until assailed in a direct proceeding, instituted for that purpose.

"This principle is approved and applied in a number of cases, subsequently decided by the same court. Among them—(see opinion.)"

And the same principle was recognized and enforced in *Ehrman* v. *Insurance Company*, 35 O. S., 324, as far as was necessary in the decision of that case.

So that our Supreme Court, by its opinion and its quotation of Federal authorities, apparently approves the Federal rule.

In the case at bar, the contract for the conveyance of the real estate has been entirely executed. Nothing remains to be done but the payment of a part of the purchase price. The Portage Construction & Finance Company does not offer to re-convey and put the other party in *statu quo,* and, as a matter of fact, it could not put the other party in *statu quo.* It has so dealt with the property, by placing improvements upon it by contracting with persons for labor and material and other things, and by making conveyances of it by mortgage deeds, that such a course is now impossible.

Can it be claimed that a corporation may exceed its authority in the purchase of property, receive a conveyance of the property, and then, after it has received all it contracted for, avoid its promise to pay, and at the same time keep the property? Such a claim will not appeal to a court of equity. *Siders* v. *The Gem City Concrete Company,* 13 C. C. (N. S.), 481. Also 10 "Cyc." 1156.

But it is not necessary to rely on the general principles of estoppel. On the principle of the cases quoted, neither the corporation, its receiver, nor the creditors, under the circumstances of this case, can successfully question the transaction by which the Portage Construction Company received title. Its title is not void, notwithstanding the transaction by which it was acquired was in excess of its powers, and the transaction is not voidable at the instance and in the situation of those who now question it.

This court is of course aware that there are earlier Ohio cases, based upon wholly different states of fact than those involved in the case at bar, in which the language used by the judges might be said to sustain a contrary conclusion on this subject, but this court ventures the opinion that

274     SUMMIT COUNTY COMMON PLEAS.

Ulmer et al. v. Portage Construction Co. et al. [Vol. 26 (N.S.)

the doctrine apparently stated in those cases with a great deal of assurance will eventually be found to have no application to the situation presented by the case at bar.

Among all the cases cited from our Supreme Court, none appears in which a corporation, which was the beneficiary of an executed contract conveying property to it, was permitted to set up its want or usurpation of authority to make the contract, to defeat an action for the purchase price. In every case where such a situation was before the court, its approval of the doctrine of estoppel, as applied to such cases, was given, and the contract held to be voidable, and not void. When a contract is void, there is, of course, no estoppel. In the case of a corporation which, under the law, cannot, under any circumstances, acquire or hold property, the court's conclusion would, of course, be that the contract is void. But that is not the situation in the present case.

No creditor can claim any injury from the purchase of this real estate. The Portage Construction & Finance Company cannot be permitted, under the opinions quoted, to question it. The receiver is in no better situation than the creditors and the corporation.

*Claim Number Two—*

The second claim made by the receiver is to the effect that the transaction by which the Portage Construction Company borrowed money from the Cleveland Discount Company is *ultra vires*, and that the notes and mortgages given to the Cleveland Discount Company and others are void by reason of the limits on the borrowing power prescribed by General Code, Section 8705. The same claim is made by some of the lien claimants and by the Herberich Realty Company.

Of the many cases cited by counsel on the subject of *ultra vires*, the same observation may be made as before, namely, very few of them deal with borrowing power of the corporation, and among those few, none are in all essentials like the case at bar.

It is conceded that the Portage Construction Company

was a corporation having the power to borrow money, so that we do not have the same question that would confront us in the case of a corporation which, under the law, could under no circumstances borrow any money.

The effect of General Code, Section 8705, is neither so plain nor simple as has been contended.

In *Kreisser* v. *Ashtabula Gas Light Company*, 20 C. C. (N. S.), 599, Judge Laubie uses the following language:

"The provision of the statute authorizing the execution of mortgages to the amount of capital stock of the company, may perhaps be of doubtful construction. At all events, the statute is not definite and does not in express terms provide that bonds and mortgages may only be executed to the extent of the capital stock paid up."

This court calls attention to this opinion of Judge Laubie because of his lengthy service on the district court and the circuit court and his standing as a judge in this state. If Judge Laubie is correct, then the borrowing contract in the case at bar is in excess of the corporate powers of the Portage Construction Company but it cannot, with certainty, be called illegal.

In the case of *The Central Trust Company* v. *The Columbus, H. V. & T. Ry. C.*, found in 87 Federal, beginning on page 815, Judge Lurton holds that a borrowing in excess is not void, and that subsequent creditors cannot object.

In the case of *Raymond, Trustee,* v. *Railway Co.*, 21 W. L. B., 103, Judge Peck, in rendering the opinion of the court, says:

"The power to borrow money and issue bonds is within the scope of the general powers of the corporation, and in such cases, a disregard of the limitations upon the exercise of the power does not render the act void to all intents and purposes."

This opinion was rendered by an eminent judge of one of our lower courts.

The earliest case cited in which the borrowing power was considered is *Bank of Chillicothe* v. *Chillicothe,* 7 Ohio, part two, page 31. In that case, it was found that

the municipal corporation had no express power to borrow money. It should also be observed that the contract had been executed on part of the bank, and the municipal corporation was undertaking to set up its own want or usurpation of authority, to avoid paying its debt. The court says, on page 35:

"The language of the defendants to the plaintiff is, in substance this: 'True you loaned to us this money. You did it at our earnest solicitation. We have used it for our own benefit, but we have no power to borrow. We violated our charter in so doing, and we will take advantage of this, our own wrongful act, to protect ourselves from the payment of that which is your honest due.' No rule of decision which will lead to such manifest injustice ought to be adopted without careful examination and much deliberation * * *. But although corporations have existed for centuries, still we have found no case in which inability to contract has been set up to avoid the payment of their debts. There are, it is true, many cases where the powers of particular corporations have been investigated and where they have been held to have exercised power not granted to them, in consequence of which their acts were void. But these have been cases where the corporations, themselves, have been striving to set up or enforce powers, not where they have set up as a defense that they, themselves, had been guilty of a usurpation of power."

On page 38 of the opinion, the court concludes as follows:

"To effect other subjects than those specified in the charter, money could not with propriety be borrowed, but if it should be, that circumstance could hardly be set up as a matter of defense against an action brought for the recovery of the money. It would rather be a question between the individual corporation and their officers or it might be between the state and the corporation."

The case of Hays and others against Galion Gas Light & Coal Company, 29 O. S., 330, was one involving the borrowing power of the corporation. The court found that the corporation did not have express power to borrow, but that it had implied power to do so. So that it was not

necessary to invoke the doctrine of estoppel.    The contract was an executed one, and the court stated that the facts gave rise to an estoppel.    It also indicated clearly that it would apply and enforce estoppel, in case of an executed contract of borrowing.    Beginning with the bottom of page 339, the court states its conclusion, thus:

"This conclusion renders unnecessary the consideration of the question of estoppel, *which the facts stated gave rise to*.    It is, however, proper to remark that the defendant, in claiming exemption from corporate liability, and insisting, as it does, in argument, that to borrow and give its notes and mortgage to evidence its obligation to pay was in excess of and beyond its corporate power and capacity, sets up its own usurpation of power to avoid the payment of what appears to be an honest debt.    That this can be done may well be doubted.    The rule seems well established that, where a contract has been executed and fully performed on the part either of the corporation or of the other contracting party, neither will be permitted to insist that the contract and such performance by one party were not within the corporate power of the company."

There are other Ohio cases on the doctrine of estoppel, as applied to unauthorized contracts which have been executed.    In the case of *The Western Strawboard Company* v. *The Variety Iron Works Company,* 17 C. C. (N. S.), 205, which involved a contract of guaranty without legislative sanction, the court uses the following language:

"A corporate contract, such as one of guaranty, made without legislative sanction, and hence *ultra vires,* but neither *malum in se* nor expressly prohibited, is not necessarily illegal, so as to preclude action upon it, and if it is fully performed on the part either of the corporation or of the other contracting party, neither will be permitted to insist that the contract, so performed by one party, is outside the corporate power of the corporation."

This opinion was rendered by the circuit court of our own county.

The case *Larwell* v. *Hanover Savings Fund Society,* 40 O. S., p. 274, was one involving the borrowing power of a

278    SUMMIT COUNTY COMMON PLEAS.

Ulmer et al. v. Portage Construction Co. et al. [Vol. 26 (N.S.)

corporation. In its opinion, on page 285, the court distinguishes between what it calls contracts that are "simply *ultra vires*" and those that are "illegal and void." On the subject of estoppel, the court expresses itself as follows, on page 284:

"The attempt of a corporation to avoid the payment of its debts by setting up its usurpation of power or the plea that a contract which it has deliberately made and of which it has received the full benefit is void for want of corporate power to make it, does not commend itself to favorable consideration. The tendency of the courts, based upon the strongest appearance of justice, is to enforce contracts against corporations, although, in entering into them, they may have transcended their chartered powers, when they have received the consideration and the benefit of the contract. And it seems to be now the well established rule that where a contract, not illegal, has been executed and fully performed on the part either of the corporation or of the other contracting party, neither will be heard to object that the contract and such performance were not within the legitimate powers of the corporation."

The court therefore reaches the conclusion that the borrowing in the case at bar was unauthorized and in excess of the powers of the corporation, but not illegal in the sense of being specifically prohibited; that the contract is voidable instead of void; that the contract having been executed, the corporation is estopped from setting up its usurpation of power to defeat an action on the contract; that no creditor has shown any injury resulting to him by reason of the borrowing; that subsequent creditors cannot complain; that the receiver, who occupies no better position than the creditors and the corporation, is not entitled to make this defense.

Without citing any authority outside of Ohio, it is proper to remark, however, that the modern trend of opinion in this country, as evidenced by decisions and text writers, will support the conclusion stated.

### CLAIM OF RAM & RAM.

Counsel for Ram & Ram urges what he calls a new proposition and theory of the law in relation to the mortgages taken by the Cleveland Discount Company. It is necessary to examine this theory before taking up questions relating to mechanic's liens, for the reason that, if his claim as to the law is sound, the problems before the court will be much reduced in number and difficulty. As gathered from arguments and statements during the course of the trial, this claim is as follows:

That when the Cleveland Discount Company contracted to loan $900,000 or more to the Portage Construction Company, it knew that the money was being borrowed for the sole purpose of putting up three buildings in question; that the loan contract was, under the operation of General Code 8321-1, a contract for the benefit of third parties, to-wit, the laborers, material men, contractors and sub-contractors who should construct these buildings; that, by the terms of said statute, the money agreed to be loaned became a trust fund, to the full amount named in the mortgages, for the benefit of the laborers, material men, contractors and sub-contractors; that the Cleveland Discount Company became the trustee of said fund, and, as such trustee, will be required to pay out the fund to the full amount named in the mortgages, in payment of the claims of laborers, material men, contractors and sub-contractors.

If this claim is sound, then the work of the court will be much simplified. All that will be necessary is to order the Cleveland Discount Company to pay into court enough of the discount retained by it to pay off the claims of the lien claimants. It will be unnecessary to determine the questions raised as to the sufficiency of the affidavits filed by the lien claimants, and the steps taken by them to perfect liens.

If what counsel claims, is true, it would seem to follow that no affidavit need be filed, nor steps taken to perfect liens on the structures. Why should a *cestui que trust* file

affidavits and serve notices to compel the trustee to pay him out of the funds under G. C., 8321-1, when that section does not require such acts of him?

If this theory can be sustained, the court will be glad to apply it in this case, for, in that event, all of the mechanic's lien questions will be immaterial and will disappear like the mist before the morning sun, the court's difficulties will be lessened, and its burdens lightened.

To test this theory, an examination will be necessary of G. C., 8321-1, of the Mechanic's Lien Laws, as they are now, and of the Mechanic's Lien Laws as they were for some years previous.

Under the Mechanic's Lien Law, as it existed before 1913, only those contracting with the owner could obtain a lien. Each claimant's lien operated as a lien from the date of the first item of labor performed, or material furnished. See R. S., 3185. One taking and recording a mortgage on property on which a building was being constructed could do so, with the assurance that the mortgage was prior to the lien of any person who furnished his first item of labor or material after the recording of the mortgage. The mortgagee could readily determine who had begun to furnish labor or material, or both, before his mortgage was recorded, and govern his action accordingly, as was commonly done, by arranging to pay those who had begun to furnish labor or material before that date, or having them waive liens. Sub-contractors and others who had not contracted with the owner did not need to be taken into account.

In April, 1913, the Legislature amended R. S. 3185 and provided that all mechanic's liens on the same job shall be superior to any mortgages which shall be given or recorded after the commencement of the excavation, construction or improvement, regardless of when the first item of labor or materials was furnished by any lien claimant, the effect of this amendment being that the mortgagee took his mortgage subject to the liens of all who furnished labor or material, or both, for the excavation, con-

struction or improvement, regardless of whether the same was furnished before or after the mortgage was recorded.
As was observed by the supreme court in the case of *Ryder* v. *Crobaugh et al.,* 100 O. S., 99, this amendment would naturally have the effect of stopping building operations entirely, and it did have that effect, and that was the situation that confronted the legislature in 1915; two years after it had amended the Mechanic's Lien Act. That was the situation which the legislature undertook to remedy by the adoption of General Code, 8321-1. The supreme Court, in the same case, says, that on account of this situation, there was a genuine necessity, in the field of building construction, for the passage of Section 8321-1, G. C. The court also found that the purpose for which this law was passed was to provide a method by which improvements could be completed by means of a mortgage loan, recorded or given after the work had commenced.

An inspection of the act, itself, in the opinion of the supreme court in the case referred to, makes it clear that this was its only purpose. It had already taken care of mechanic's lien claimants so thoroughly that owners could not borrow money for construction purposes.

*Requisites of a Construction Mortgage—*

The requisites of a construction mortgage, under this act, are as follows:

First. The mortgage must be given in whole or part, to improve real estate, or to pay off prior incumbrances, or both.

Second. It must contain the name and address of the mortgagee.

Third. It must contain the covenant provided for in the statute.

Fourth. The construction, excavation or improvement must be begun before the filing of the mortgage; otherwise, its lien is fixed by the Recording Act, and not by Section 8321-1. See 100 O. S., 98.

*Priorities—*

The priority of a construction mortgage depends upon the following things:

The proceeds must be used either in paying off prior incumbrances or in paying for the doing of one or more of the things prescribed in General Code, Section 8310, or both.

Second.    The mortgage must be filed for record before the affidavits for mechanic's liens are filed with the recorder.

Third.    The payment of the proceeds of the mortgage must be made in accordance with the provisions of General Code, Section 8321-1.

*Extent of Priority—*

A mortgage shall have priority to the extent that the proceeds are used and applied for the purposes above stated, and to the extent that they are paid pursuant to the provisions of General Code, Section 8321-1.

*Payments to Contractors and Sub-Contractors—*

If it was intended to create a trust fund in favor of contractors, sub-contractors, material men and laborers, then the section should provide either in express terms, or by language that would require that interpretation.    An examination of this act shows that no provision is made for the payment of any money by the mortgagee, to either contractors or sub-contractors, either during construction, or at its completion, except only in the matter of meeting labor payrolls, as provided by Sub-section 3, as follows:

"Such mortgagee may, from time to time, pay out, on the owner's order, directly to contractors or sub-contractors, or as said owner may certify to be necessary to meet and pay labor pay rolls for said improvement.

It will be observed that, even in the matter of furnishing money to meet labor pay rolls, no duty is imposed on the mortgagee.    He may pay on the owner's order, but he is not required to do so.    It follows that, if the mortgagee, during the course of construction, pays any money to the contractors or sub-contractors, except in the mat-

ter of meeting labor pay rolls as provided in Sub-section 3, he is paying out in violation of this act. When the improvement is completed, the act does not require the mortgagee to make any payments to contractors and sub-contractors, and he cannot do so except on order of the owner; as provided in Sub-section 7.

Seventh: "Such mortgagee shall pay the balance, if any, of said mortgage fund, after said improvement is completed, to the owner, or to whomsoever he may direct."

If the Legislature had intended a trust in favor of contractors and sub-contractors, one would think that Sub-section 7 would direct that they be paid out of the fund in the mortgagee's hands, but no such direction is given.

It appears, then, that the Legislature did not, by this act create any new rights in favor of contractors and sub-contractors, and did not have in mind to make the money loaned a trust fund in their favor.

*Payments to Laborers and Material Men—*

Sub-sections 4 and 6 govern payments to material men and laborers. Payment to them can only be made on the owner's order. No provision is made that they be paid in full. Sub-section 4 seems to have been designed particularly to favor the mortgagee, so that he might have a completed structure as his security, even though, under the circumstances, laborers and material men might not be paid in full. Sub-section 4 does not appear to have any other purpose. If the situation provided for in Sub-section 4 does not occur, then the mortgagee shall pay out as provided in Sub-section 6.

This court finds that, when the legislature used the words, "may" and "shall," in this act, it did so designedly, so that the court cannot interpret "may" to mean "shall." In other words, the legislative intent and the expression of that intent exactly coincide, in that respect.

This view is re-enforced by the provision that such mortgage shall have priority to the extent that the proceeds thereof are used and applied for the purposes set forth in

284    SUMMIT COUNTY COMMON PLEAS.

Ulmer et al. v. Portage Construction Co. et al. [Vol. 26 (N.S.)

the act, and the further provision, in the last paragraph of the act, which provides:

"The provisions of this section shall, as to mortgages herein contemplated, control over all other provisions of the General Code relating to said mechanic's, material men's, contractor's, sub-contractors, laborer's and all liens that can be had under the provisions of this chapter, anything to the contrary in the said General Code notwithstanding, and shall be liberally construed in favor of such mortgagees, a substantial compliance by such mortgagees being sufficient."

The court, therefore, must come to the conclusion, somewhat regretfully, but none the less certainly, that General Code, 8321-1, presents no evidence either internal or external, in support of the trust fund theory. Ram and Ram must stand or fall on the provisions of the lien law.

The court finds that Ram and Ram were contractors, and not laborers. They contracted to do the painting for a stipulated price, and to furnish the necessary materials and labor. They did not at any time furnish the verified statements, accompanied by certificates, as required by G. C., Sec. 8312.

It is also worthy of note that when Ram and Ram filed their affidavits for lien, more than two years ago, and at a time when their recollection should be better than now, they claimed under a verbal contract, made May 20, 1920. Now, they endeavor to change the date of the contract and their first labor under it. Ram's testimony as to dates is shown to be mistaken in important particulars, an illustrative example being the date of the construction of the so-called Minter house.

On account of their failure to furnish the verified statements required by General Code, Sec. 8312, they have no lien. The authorities that support this conclusion are cited in the discussion of the claim of Charles Buyers.

### CLAIM OF CHARLES BUYERS.

Buyers entered into a contract to furnish and perform all the carpenter work.

It will be unnecessary to state, in full, the ultimate facts concerning the claim of Charles Buyers, as shown by the evidence. It will be sufficient to say that the claim of Charles Buyers is that of a contractor, and not that of a laborer or material man.

In his original answer, he claims under a written contract, made May 18, 1920, and that the last labor was performed on July 30, 1921. In his affidavit for a lien, he names July 30, 1921, as the date when the last labor was performed. The affidavit for a lien was filed September 29, 1921. So that, on its face, the affidavit was not filed within sixty days of the time when the last labor was performed, as stated in the affidavit.

After the lapse of over two years since he filed his affidavit, Buyers now wishes to amend, in effect, his affidavit for a lien, so as to show that the last labor was performed on August 6, 1921, instead of July 30, and to amend his answer likewise, and to show the making of his contract on the 10th of April, instead of the 18th of May, 1920. Why his recollection should be better now than two years ago is unexplained. Neither are the alleged errors explained.

Buyers' claim for a lien is controverted on several grounds, one of which is the insufficiency of the affidavit, on its face, because it shows that it was not filed within sixty days after the performance of the last labor.

Counsel for Buyers says that the mortgagee in this case, the Cleveland Discount Company, ought not to be permitted to make this objection. It must be remembered that the objection to Buyers' claim of lien is made not only by the Cleveland Discount Company, but also by the receiver of the Portage Construction & Finance Company, who represents the owner and creditors. There is nothing in this case to prejudice the right of the receiver to object to Buyers' claim for a lien.

Counsel for Buyers claims that the statute providing for this affidavit does not expressly require that the date when the last labor was performed, under the contract, be set out in the affidavit. That is true. Neither did the section in force before 1913 require the setting out of the date of the last item. But both the law, as it existed before 1913, and the section as it now exists, have been construed by the courts of this state so as to require a statement either of the date of the last item, or to state that the last item of labor was performed, or material furnished, within sixty days, or four months, as the case might be, of the time when the affidavit was filed with the recorder. Courts of other states have similarly construed like statutes.

The court might therefore find, under the circumstances of this case, that Buyers has no lien, basing its conclusion on those cases which hold that the affidavit must, on its face, establish that it was filed in time, and that when the affidavit, on its face, shows that it was not so filed, the claimant has no lien, and that his affidavit cannot be amended.

Some of the cases sustaining this proposition are as follows:

*In Re Kinnane*, 14 O. L. R., 531.

*Maclin, Receiver*, v. *The Miller Improved Engine Co.*, 13 C. C. (N. S.), 94.

"The legality of the mechanic's lien should affirmatively appear on the face of the statement filed with the recorder, and where the ilen is rendered invalid, by failure to state that the work was completed within four months of the filing of the affidavit, the party holding the claim will not be permitted to supply the deficiency by parol, and must submit to the loss of his lien."

It should be observed that, when this case arose, the law did not expressly require that the date of the last item should be stated in the affidavit.

The following cases support the same conclusion:

*Olson et al.* v. *Heath Lumber Company*, 33 N. W., 791.

Also *Mills Carleton* v. *House,* Vol. 4, p. 170, unreported opinions Eighth District Court of Appeals, opinion by Judge Meals.

Counsel for Buyers states that, in the case of *Maclin, Receiver,* v. *Miller Improved Gas Engine Company,* decision was rendered with reference to the rights of a subsequent creditor. But there is nothing in the syllabus, nor in the title, nor in the report of the case, that indicates such a situation. The case was brought by Maclin, as receiver, against the company that was claiming a lien, in the circuit court.

Another objection to Buyers' claim for a lien is that he did not furnish the sworn statements to the owner, as required by General Code, Section 8312.

Some question has been made as to the meaning of the term, "original contractor" or "contractor." General Code, 8312, uses the term in the singular, but that need cause no difficulty. There may be one or more original contractors on the same improvement. All who, by means of their contribution of labor and material on the job, under contracts directly with the owner, help to make the improvement, are original contractors, within the term of General Code, Section 8312.

In the case of *Geer* v. *Tuggle et al.,* 22 O. N. P. (N. S.), 129, the court states the following as its construction of the law:

"Under the mechanic's lien law, there may be as many original or principal contractors as there are persons contracting with the owner for any part of the work."

In the case of *Sterner* v. *Haas,* 108 Michigan, page 488, the court says:

"Section 4 (Michigan Mechanic's Lien Law) expressly provides that the contractor shall have no right of action until such statement is furnished."

"A plumber and gas fitter who furnishes necessary materials and labor for plumbing, roofing, steam heating and electric wiring and building, is a contractor, within the meaning of the statute, and not a material man, although

288     SUMMIT COUNTY COMMON PLEAS.

Ulmer et al. v. Portage Construction Co. et al. [Vol. 26 (N.S.)

an aggregate price for the work and material furnished was not agreed upon."

In addition to filing a proper affidavit for a lien, as provided in General Code, Section 8314, and serving notice, as provided in General Code, 8315, each contractor must, when money becomes due him from the owner, give to the owner the sworn statement and other statements and certifications provided for in General Code, Section 8312. If he fails to do so, and until he does so, the contractor shall have no right of lien against the owner, on account of such contract. Such statements must be filed with the owner before the time expires in which the claimant may perfect a lien.

In support of this conclusion, see *In Re Kinnane*, 14 O. L. R., 531.

In the *Kinnane case*, there were a number of original contractors. The same requirement is made as to both contractors and sub-contractors. The court of appeals of this county, in the case of *Sanford Sheet Metal Company* v. *Amiens*, considered this subject and said:

"This claim (claim for lien) must be denied, for two reasons, first, Plaintiff being a sub-contractor and not merely a material man or a laborer, was required not only to file its affidavit for a lien, with the recorder, and serve a copy thereof with the owner, as provided for in G. C., Sections 8314 and 8315, but it was also required to file proper preliminary statements, accompanied by certificates, as provided for in G. C., 8312, which it is admitted was not done in this case."

Another court of appeals case, holding the same conclusion, is that of *Gannon et al.* v. *Poller & Teare Company*, 300 C. A., 566. The only difference between contractors and sub-contractors being that the sub-contractor complies with the law when he delivers the statements to his contractor. *Silver* v. *Thomas*, 9 O. Appellate Reports, 187.

This provision of the statute is for the benefit of the owner and other contractors, sub-contractors, laborers and

material men, and its provisions cannot be waived or avoided by the contractor or sub-contractor.

The same kind of claim was disposed of by Judge Sater, in the following manner, in the case of *In Re Kinnane*, 14 O. L. R., 531:

"The furnishing of a verified statement by the original contractor, to the owner, in the manner and form provided by the statute, showing the name of every sub-contractor and laborer engaged on the work, and of those furnishing material, with the amounts due in each case, is a condition precedent to the perfection of a lien, and relief from furnishing such a statement is not afforded by the fact that all claims for labor and material have been paid in full, nor by the provision found in the statute that it shall be liberally construed, and the claim does not lie that the owner, by reason of his knowledge as to who was furnishing the material used, had waived his submission of such claim, or because of his failure to ask for a statement."

See, also, *Phillips* v. *Brahm & Company*, 19 O. N. P. (N. S.), 366.

In the case at bar, there is, of course, no pretense that Charles Buyers at any time furnished the statements and certificates required by General Code, Section 8312.

Counsel for Buyers claims that the case of *Chapell* v. *Smith*, 40 Neb., 579, was between the lien claimant and a subsequent mortgagee. That is true, and, as usual, the court went only as far as necessary, in deciding that case.

He also cites the case of *Curr-Murray Manufacturing Company*, 124 Michigan, p. 111, to show that a preliminary affidavit is not necessary. A careful examination of this case will show that what was really decided was the following: that is, that a material man need not file a preliminary statement, and of course that is true under our law. The plaintiff in that case is described as follows:

"Manufacturers who sell window frames, sash and doors, made in their own shops for use in a building in process of erection, are material men, to whom the above requirement (preliminary statements) does not apply."

The case is authority for the exact converse of the prop-

.osition maintained by counsel, the first syllabus of the case being as follows:

"Under Section 4 of the Mechanic's Lien Law, requiring that original contractors furnish to the owner sworn statements giving names of all sub-contractors, laborers and material men under their contracts, with the amount due each before they shall have any right of action or lien against the owner, where by the terms of the contract labor is to be expended on the premises, *such statement is indispensable, notwithstanding the owner and the contractor are the only parties interested.*"

To the same effect is the case of *Sterner* v. *Haas*, 108 *Michigan*, 488:

"The Mechanic's Lien Law is in derogation of the common Law, and all rights under it are statutory and cannot be extended beyond the provisions of the statute. By the express terms of Section 4 of the law, a contractor must furnish a sworn statement to the owner, giving the names of all laborers and material men under his contract, with the amount due each, before he can maintain a suit to enforce a lien. A failure to comply with this requirement of the statute is not excused by the fact that all material and labor has been paid for, and that such statement has never been requested by the owner."

Counsel also cite the case of *Fleming* v. *Galloway*, 212 Illinois App., 226, as holding that the making and giving of this affidavit is not a pre-requisite to a suit to foreclose a mechanic's lien. The holding cited is entirely correct, under the statute of Illinois, the provisions of which differ radically from those of the Ohio law. Section 7143, Illinois Laws, is as follows:

"It shall be the duty of the contractor to give the owner, and the duty of the owner to require of the contractor, before the owner or his agent architect or superintendent shall pay or cause to be paid to said contractor or to his order, any moneys or other consideration due or to become due such contractor, or make or cause it to be made to such contractor any advancement of any moneys or any other consideration, statement, in writing, under oath, verified by affidavit, of the names of all parties furnishing materials and labor, and of the amounts due or to become due each. The merchants and dealers in materials, only,

shall not be required to make the statements herein provided for."

It must be observed that the Illinois statutes nowhere provide what shall happen, or that anything shall happen, or any penalty be imposed, if the statement is not furnished, while the Ohio law, General Code, Section 8312, specifically provides: "Until the statements provided for in this section are made and furnished in the manner and form as herein provided the contractor shall have no right of action or lien, against the owner, part owner or lessee, on account of such contract."

The pertinent language of General Code, Section 8312, and of the Michigan law, are the same, the statement in the Michigan law being as follows: "Until the statement provided for in this section is made, in manner and form as herein provided, the contractor shall have no right of action or lien against the owner, part owner or lessee, on account of such contract."

In the case of *Wiltsie* v. *Harvey,* 114 Michigan, 131, the court says:

"Under Section 4 of the Mechanic's Lien Law, requiring that original contractors furnish to the owner sworn statements giving the names of all laborers and material men under their contracts, with the amount due each, before they shall have any right of action or lien against the owner, *service of such statement is* prerequisite to the bringing of a suit *to enforce a contractor's lien."*

This case is an authority on another question raised by counsel for Buyers, and that relates to who may make the objection to Buyers' lien. In the third syllabus, the supreme court of Michigan says:

"An adverse lienor is entitled to assert the invalidity of a lien because of a failure to serve upon the owner the statutory statements above referred to, although a bill to enforce such a lien has been taken as confessed by the owner."

The adverse lienor referred to in this case was not an-

292    SUMMIT COUNTY COMMON PLEAS.

Ulmer et al. v. Portage Construction Co. et al. [Vol. 26 (N.S.)

other mechanic's lien claimant, but the City Savings Bank of Detroit.

It is unfortunate that Buyers did not file with the owner the statements required by General Code, 8312. He did his work under his contract, and he is unequestionably entitled to payment, but that is far from saying that he is entitled to lien. A lien is purely a creature of statute, and to avail himself of it the claimant must do the things required of him. The language of the statute is plain and mandatory. It is difficult to understand why Buyers should neglect to furnish the required statement, in spite of the plain requirement of the law.

On account of the fact that Buyers did not comply with the provisions of General Code, Section 8312, the court finds that he has no lien on the premises.

### CLAIM OF THE ZINDLE PLUMBING & HEATING CO.

On November 23, 1920, the Portage Construction Company entered into a contract with the Zindle Plumbing & Heating Company by the terms of which the Zindle Plumbing & Heating Company agreed to furnish and install radiator shields in the three buildings for $3,450.

In April, May and June, of 1921, it installed radiator shields in the Twin Oaks Building and completed its work in that building with the exception of about seven hours work. On account of work being carried on by interior decorators it was not practicable to finish the installation of shields in the Twin Oaks Building in June, when the Zindle Plumbing & Heating Company did its last work there.

On or about August 12, 1921, receivers were appointed for the Portage Construction Company. Louis Miller at various times, both before and after the appointment of the receivers asked the Zindle Plumbing & Heating Company to complete the installation of shields in the Twin Oaks building, and the Zindle Plumbing & Heating Company replied that it would put the remainder of the shields in before cold weather.

On the 19th day of October, 1921, the Zindle Plumbing & Heating Company, by one of its workmen, performed six hours' work and on the 23d day of October, 1921, it performed one hour's work in installing the remainder of the radiator shields in the Twin Oaks building.  After the installation of the shields in the Twin Oaks building, Louis Miller, President of the Portage Construction Company, and one of the Receivers, agreed with the Zindle Plumbing & Heating Company that the price for the complete installation on the Twin Oaks building should be $1,489, no part of which has been paid.

On December 13, 1921, the Zindle Plumbing & Heating Company filed with the recorder its affidavit for a lien on the entire premises, for $1,489.   On the same date it served on Louis Miller, Receiver of the Portage Construction Company, a copy of the affidavit, and the sworn statement by the contractor required under General Code, Section 8312.

On September 8, 1922, the Zindle Plumbing & Heating Company entered into a contract with the receivers of the Portage Construction & Finance Company to furnish and install radiator shields in the Pasadena and Mayfield buildings, for $1,900, which was accordingly done and paid for.

It is urged that the Zindle Plumbing & Heating Company has no lien for the following reasons:

First: the affidavit for lien does not show affirmatively on its face that it was filed within the time required by Section 8314.

Second: that the last substantial labor was performed in June, and the affidavit for lien was not filed until December 13.

Third: that some insubstantial work was done in October, after the appointment of the receiver, but that this work cannot be tacked onto the work done for the owner so as to extend the time for filing the lien.

Fourth: that the statutory period of sixty days begins to run from the time of the appointment of the receiver, and expired within sixty days thereafter.

294    SUMMIT COUNTY COMMON PLEAS.

Ulmer et al v. Portage Construction Co. et al. [Vol. 26 (N.S.)

There is nothing in the affidavit to indicate when the last of the work was done, or in fact, when any was done. It would be impossible to tell from the affidavit whether the contract was made and the work done one, five or ten years ago. It makes the following statement: "The last of such material has not been furnished or labor performed under said contract for the reason that said, the Zindle Plumbing & Heating Company, has been prevented from furnishing said material or performing said labor by said owner.

General Code, Section 8314, does not in express terms require that the affidavit should show when the last labor was performed, but it does provide that the affidavit must be filed within sixty days of the time when the last labor was performed.

General Code, Section 8321, provides that the lien shall operate from the date when the first labor was performed if the claimant is the contractor.

General Code, Section 8314, as it existed before 1913, provided that the affidavit should be filed within four months from the time of completing such labor; also that it should operate as a lien from the date of the first item of labor performed. It did not expressly provide that the affidavit must state the date when the last labor was furnished. However, the holdings of the courts under former Sec. 8314, were to the effect that the affidavit must show affirmatively on its face that it was filed within four months after the date of the last item of labor or material furnished. The affidavit must either give the date of the last item or state that it was performed within four months.

*Macklin, Receiver,* v. *Miller Improved Gas Engine Company,* 13 C. C. (N. S.), 94, *supra.*

*In Re Kinnane,* 14 O. L. R., 531, *supra.*

*Miller, Carleton Co.* v. *House,* Vol. 4, page 170, unreported opinions, 8th District Court of Appeals, opinion by Judge Meals, *supra.*

Courts of other states in construing essentially similar statutes announce the same rule. In the case of *Chappel*

v. *Smith,* 40 Neb., 579, the supreme court states the law as follows:

"The failure of an account and its accompanying statement filed to secure a mechanic's lien to disclose affirmatively that such filing is within the requisite time to entitle to the lien claimed operates to defeat the relation back of such lien as against liens (mortgages) in existence before the filing of such account."

In the case of *Noll* v. *Kenneally et al.,* 37 Neb., p. 879, the court states the law as follows:

"The failure of an account filed to secure a mechanic's lien to state the dates the various items of materials were furnished, will not vitiate the lien if it appears from the account and affidavit thereto attached that such materials were furnished within the requisite time to entitle the claimant to a lien therefor."

On page 885 the court uses the following language:

"When the dates of performing the labor or furnishing the materials are not given in the account it should be made to appear in the affidavit thereto attached that the materials were furnished or labor performed within the time prescribed by statute to entitle the claimant to a lien therefor."

Former Section 8314 required an itemized statement of the amount and value of the labor or material furnished, but did not provide that the dates should be given. Present Section 8314 requires a statement of the amount due instead of the items making up the amount.

The same considerations and resoning which led courts to the conclusion that under former Section 8314 either the date of the last item must be stated or it must be stated that it was performed or furnished within four months require that the affidavit under the present section must either give the date of the last item or state that it was performed or furnished within sixty days. In respect to the question under consideration the two sections are essentially the same.

If the decisions cited are correct then it follows that the Zindle Plumbing & Heating Company has no lien because of its failure to state in its affidavit either the date when

the labor was performed or that it was performed within sixty days.

If the only parties interested were the lien claimant and the owner, a different solution might possibly be arrived at. The claimant's purpose in claiming a lien is that its claim may be related back to a time antedating the claims of the mortgagees. As against the mortgagees and creditors the Zindle Plumbing & Heating Company can obtain a lien in only one way, and that is by filing an affidavit that shows on its face that it was filed within sixty days after the furnishing of the last labor or material.

40 Neb., 584, *supra.*

The work done by the Zindle Plumbing & Heating Company in October, 1921, was a part of the work required under the contract. It was requested to do this work by Louis Miller, President of the Portage Construction & Finance Company, and for a time one of its receivers.

It cannot be successfully claimed in this case, as it often is, that the Zindle Plumbing & Heating Company merely went back to the job in October and did some inconsequential thing to enable it to claim a lien. Its work under the contract was not completed when the receivers were appointed. More than sixty days elapsed between the time when it performed its last labor and the appointment of the receivers on Aug. 12, 1921. When the receivers were appointed, what was it necessary for the Zindle Plumbing & Heating Company to do to perfect a lien? Was it necessary that the affidavit should be filed within sixty days from the date of the appointment of the receivers? The sixty day period had previously not begun to run, on August 11, the day before the receivers were appointed, because the time had not arrived when it was proper to file an affidavit for a lien. When did it begin to run?

When the receivers were appointed the Zindle Plumbing & Heating Company was entitled to a reasonable time in which to determine what it would do under the circumstances, whether to insist on its contract or abandon it, and also to learn what the receivers and the Portage Con-

struction & Finance Company proposed doing; also to learn whether the Portage Construction & Finance Company would be able to raise the necessary money to have the receivership discharged, go on with its business and complete its buildings under the contracts.

In fact we have it from the statement of counsel of the Cleveland Discount Company in this case that the receivers were appointed to preserve the situation for some months while efforts were made by the Portage Construction & Finance Company to work out a method of raising the necessary money to discharge the receivership go on with its business and complete the buildings.    These efforts resulted in failure.    On the other hand, suppose the Portage Construction & Finance Company had succeeded at the end of six months or more in getting the necessary money to complete its buildings and the receivers were discharged and the Zindle Plumbing & Heating Company had then gone on and completed its contract, and taken the proper steps to obtain a lien?    It would not be claimed that the sixty days had begun to run from the appointment of the receivers.    Why should the fact that the efforts to raise money ended in failure then require that the sixty day period begin to run from the appointment of the receivers?

This affidavit for a lien was filed December 13, 1921, four months after the appointment of the receivers.    The last work was done on the Twin Oaks building on October 19, and 23, as already stated.

It is not necessary to determine what, under the circumstances was a reasonable period of time at the end of which the sixty day period began to run.    The other two buildings were not far enough advanced so that the Zindle Plumbing & Heating Company could have done its work in them at that time.

The claimant was entitled to such reasonable time plus sixty days.    The court finds that the time that elapsed was not unreasonable.    It does not appear that the claimant was ever notified or given reason to believe that it had become impossible to go on with the buildings.

298     SUMMIT COUNTY COMMON PLEAS.

Ulmer et al v. Portage Construction Co. et al. [Vol. 26 (N.S.)

After the claimant completed its work on the Twin Oaks building, it and Louis Miller agreed on the amount due for that much of its work.

On the 8th day of September, 1922, the Zindle Plumbing & Heating Company, and the receivers made a contract for the installation of radiator shields in the two remaining buildings, and thereby by mutual consent abandoned the original contract.

If when the receivers were appointed the claimant had been notified that the completion of the buildings was impossible, or that the receivers of the Portage Construction & Finance Company had decided that the building should not be completed, and that the company's affairs should be wound up by the court in the ordinary way by foreclosure and sale, the sixty day period would have run from the date of such notice for the reason that such notice would fix the time at which completion became impossible.

It is, of course, true that there is but little if any authority, supporting the court's conclusions on this subject, and it may be that they are incorrect. Such as they are, they are based on what appears to be the reasoning indicated by the situation before us. Manifestly the provisions of the mechanic's lien law do not contemplate such a situation.

On this subject the following cases are of interest: *Commonwealth Roofing Co.* v. *North American Trust Co. et al.,* 135 Fed., p. 984. In the first syllabus the court uses the following language:

"While the appointment of a receiver for the property of a corporation may entitle one engaged in the performance of a building contract with the corporation to treat such contract as abandoned as of the date of the receiver's appointment, he is also entitled to a reasonable time before electing to do so for the purpose of ascertaining what may be done by the parties in interest or the receiver with respect to the completion of the work."

The discussion of the subject by the court on pages 986 and 987 enlarges upon this subject.

Also the case of *Feick* v. *Stephens et al.,* 250 Fed., at p. 185.

The court finds that the Zindle Plumbing & Heating Company has no lien on account of its failure to state in its affidavit for a lien either when the last labor was performed or material furnished, or that the same was furnished or performed within sixty days.

### CLAIM OF THE KINNEAR RUSSELL PLUMBING & HEATING COMPANY.

The Kinnear-Russell Plumbing & Heating Company did its work under three separate and distinct contracts. The first contract was entered into, in writing, on April 6, 1920, and provided for the plumbing and heating of the Twin Oaks building, for the sum of $37,925. Nearly a month later, the second contract was entered into, in writing, on May 3, 1920, and provided for the plumbing and heating of the Mayfield building, for $41,000. About five months later, the third contract was entered into, in writing, on the second day of September, 1920, and provided for the plumbing and heating of the Pasadena building, for $26,500.

The court finds, from the testimony of Kinnear, Stehle, Fidler and Westfall, and Stehle's time book and the time slips of the Kinnear-Russell Plumbing & Heating Company, that it began its work, under its contracts, after May 10, 1920.

The Kinnear-Russell Plumbing & Heating Company undertook to perfect its lien right in the premises by filing one affidavit with the recorder of this county, on September 28, 1921, to cover the balance due for labor and material furnished, as stated in the affidavit.

The principal objections that are urged against its claim for a lien are as follows:

First: That no affidavit, verified before any person authorized to administer oaths, has been executed or filed by it with the county recorder.

Second: That a copy of the affidavit filed with the re-

corder was not served upon the owner within thirty days after the filing with the county recorder.

Third: Also, that a single affidavit for a lien was filed, when three separate affidavits were necessary.

While the act of the Kinnear-Russell Plumbing & Heating Company in having its affidavit subscribed, "The Kinnear-Russell Plumbing & Heating Company by R. E. Kinnear," is not to be commended or approved, the court finds that there has been substantial compliance with Section Number 8314, G. C., at least *prima facie* so. The statute requires that the affidavit be verified, that is, sworn to, before an officer authorized to administer an oath. It does not expressly require that it be subscribed by the person making the oath, although that is clearly the better practice.

The affidavit recites: "Ralph E. Kinnear, President of The Kinnear & Russell Plumbing & Heating Company, being first duly sworn, says," etc. It is subscribed, "The Kinnear & Russell Plumbing & Heating Company, by R. E. Kinnear, President." The Notary's certificate says: "Sworn to and subscribed before me, this 26th day of September, 1921."

In the absence of any opposing testimony, the court will assume that Ralph E. Kinnear was first duly sworn, and that the affidavit is a substantial compliance with G. C., 8314. This conclusion is supported by the holding of the supreme court of this state, in the case of *Gambrinus Stock Company* v. *Webber*, 41 O. S., page 689, the syllabus of which makes the following statement:

"In the making of the statement of the mortgagee required on a chattel mortgage, the agent of the corporation omitted to affix his name thereto. Underneath the statement was a certificate by a notary public, duly signed and sealed, which, in effect, stated that the statement was sworn to by the mortgagee before him. *Held* that this verification is sufficient *prima facie,* and can only be overcome by evidence that the statement was not in fact sworn to by a proper agent of the corporation."

The fact, if it be a fact, that the copy of the affidavit for a lien was served on the owner before the affidavit,

itself, was filed with the recorder, instead of within thirty days thereafter, will not invalidate the lien. This conclusion is supported by the language of the supreme court of Michigan, in the case of *Fairbairn* v. *Moody et al.,* 116 Michigan, page 61. Under the mechanic's lien law of Michigan, it was provided that the notice must be served within ten days after filing of the affidavit. The supreme court announces its conclusion in the following language:

"Where service of a notice of filing a mechanic's lien was made on the day of its date and one day before filing, it is a substantial compliance with the mechanic's lien act, providing that the notice must be served within ten days after filing."

The fact, if it be a fact, that the so-called preliminary sworn statements were served on the owner after the affidavit for a lien was filed with the recorder, will not operate to invalidate the lien.

This conclusion is supported by the holding of the common pleas court of Hamilton county, in the case of *Phillips* v. *Braham & Company,* 19 N. P. (N. S.), 229, the holding by the court being in the following language:

"The sworn statement required by the provisions of Section 8312, General Code, to be served on the owner, in order to perfect a mechanic's lien upon the owner's premises, is not required to be served prior to the time of filing the affidavit for lien in the office of the county recorder, but may be served at any time before the time to file the lien expires, the lien not becoming effective until the statement is served."

It is urged that since there were three separate, distinct contracts, it was necessary to file three affidavits for lien, and because but one affidavit was filed, the claim for lien fails. This contention involves a consideration of the provisions of Section 8310 and 8316. General Code, 8316, is a remedial statute. It apparently describes or defines the situation in which but one affidavit need be filed, where more than one building is constructed.

The General Assembly evidently thought that there was need of this statute, and that without it, separate affi-

302     SUMMIT COUNTY COMMON PLEAS.

Ulmer et al v. Portage Construction Co. et al. [Vol. 26 (N.S.)

davits would be required for each structure, by virtue of G. C., 8310. It is also fairly obvious that the legislature believed, and with good reason, that under the provisions of G. C., 8310, a lien for the material and labor furnished on a particular building would attach only to that particular building and the land on which the building stands, and not to other buildings on the same tract or lot..

It is necessary to determine whether the claim of the Kinnear-Russell Plumbing & Heating Company is brought within the provisions of G. C., 8316, which provides as follows:

"Where the construction, excavation or improvement consists of two or more buildings, united together, situated on the same lot or contiguous or adjacent lots, or of separate buildings upon contiguous or adjacent lots, or where machinery, material, fuel or labor has been furnished for improvements or structures which are located on separate tracts or parcels of land, but operated as an entire plant or concern *and erected under one general contract* the lien for labor, machinery, material or fuel so furnished shall attach to all such constructions, excavations or improvements, together with the land upon, around or in front of which such labor, machinery, materials and fuel are furnished, the same as hereinbefore provided in case of a single construction, excavation or improvement, and it shall not be necessary to file a separate lien for each construction, excavation or improvement."

There have been but few decisions in Ohio construing General Code, 8316, and they give us no assistance in solving the problems of the case at bar.

One of the first things necessary to be examined is the phrase in General Code, 8316, "and erected under one general contract." Must there be one general contractor, having a contract covering the construction of all of the buildings, in detail, before this statute may become effective so as to allow a lien claimant to perfect his lien by the filing of one affidavit? This question must be answered in the negative.

In the case at bar, there was, of course, no such one general contractor. There were some contractors who had general contracts applying to all the buildings, such as the

Zindle Plumbing & Heating Company. There were other contractors whose contracts were separate and distinct, and not general.

Section 7249 of the Laws of 1919 of the state of Missouri is more similar to General Code, 8316, than any other that has come to the court's attention. It provides as follows:

"Section 7249. When the improvement consists of two or more buildings, united together, situated upon the same lot or contiguous lots, or separate buildings upon contiguous lots, or a contiguous or connected sidewalk in front of or alongside of contiguous lots, and erected under one general contract, it shall not be necessary to file a separate lien upon each building or lot, for the work done or materials furnished in the erection of such improvements."

A general contract is defined by the Kansas City Court of Appeals, in the case of *Bulger* v. *Robertson*, 50 Mo. App., 503, as a contract that is not confined to any single or definite building, but relates to all the buildings. A contract is not general when it relates to a single building and not to all.

In the case of *Gruner & Brothers Lumber Company* v. *Jones et al.*, 71 Mo. App., 110, the court of appeals of St. Louis, in constructing the Missouri statute, says:

"The words, 'one general contract,' in Section 6729, R. S., 1889, are not restricted to the contractor for the erection of buildings or making of improvements, but include a material man who makes a general contract to purchase all the material or all of a specified kind for the buildings or improvements."

So that the question is not, did someone else have one general contract, but did the claimant, the Kinnear-Russell Plumbing & Heating Company, have one general contract. As already stated, it had three separate and distinct written contracts, each complete in itself, and each providing for the plumbing and heating of a separate and distinct building. These buildings have no physical connection. Each is an independent unit. Substantially one month elapsed between the making of the first and second

`304`    SUMMIT COUNTY COMMON PLEAS.

Ulmer et al v. Portage Construction Co. et al. [Vol. 26 (N.S.)

contracts, and five months between the making of the first and third contracts.

During the course of construction, the Kinnear-Russell Plumbing & Heating Company presented separate estimates on each contract, for payment, and treated the three contracts as separate and distinct. It also waived its lien on the Twin Oaks building, but notwithstanding such waiver and its three contracts, it attempted to perfect one lien on the whole tract.

It is also worthy of note that the affidavit filed does not· state the amount due on each contract, but merely claims a general balance due for labor and materials furnished in pursuance of "a certain contract." The affidavit does not state when the last labor was performed or material furnished, but does state that it was furnished on the —— day of August, 1921.

What, then, is the situation of the Kinnear-Russell Plumbing & Heating Company? If each of these contracts provided for work on all the buildings, so that each related to and covered the same buildings, and the material and labor were furnished under a certain contract, as stated in the affidavit, a different situation would be presented. But with separate and distinct contracts such as these, the rule must be as announced in *Flannigan Brothers* v. *O'Connell et al.*, 88 Mo. App., page 1, in which the court says:

"Where separate buildings are constructed on contiguous lots, under one contract, the lienor need file only one lien, but where distinct contracts are made for different parts of the work, they must be treated separately."

So that, if it be assumed that the three buildings may otherwise be brought within one of the classifications of General Code, 8316, yet the fact that the claimant did not do its work under one general contract would seem to indicate that no valid lien could be perfected by the filing of one affidavit, such as was filed.

Counsel cites *Choteau et al.* v. *Thompson & Campbell,* 2 O. S., 114. In that case, the only lien held good·was

that of Greenwood.   He claimed in his answer on a general contract and account, and the court found in his favor, that is, that he did have a general contract, although not strictly speaking one entire contract.   "One general contract" is a broader and different term from "entire contract."

The court says further, on page 126:

"Where materials are furnished, from time to time, for a particular purpose, as for instance the construction of a house, and the dates are so near each other as to constitute one running account, the lien dates from the time when the first article was supplied, although, strictly speaking, the articles were not furnished under one entire contract."

But the court does not say you may nave a lien as the result of filing one affidavit for three separate houses, when you have three separate and distinct contracts, covering their erection, with each contract complete within itself, and with a different purpose in each contract.

Something was said as to the indiscriminate use of the materials on these buildings.   That was not true of the material used and furnished by the Kinnear-Russell Plumbing & Heating Company, but it probably was as to some of the brick, cement and lime used in the buildings, so that the Kinnear-Russell Plumbing & Heating Company cannot claim anything from that fact.

The particular purpose spoken of by the court in the case of *Choteau* v. *Thompson, supra,* appears in each of these three contracts.   The particular purpose of the first contract was directed to the plumbing and heating of the Twin Oaks building, and of the second, the plumbing and heating of the Mayfield building, and of the third, the plumbing and heating of the Pasadena building.

Counsel cites *Parsons* v. *Keeney,* 120 Atlantic, 505, from the supreme court of Connecticut, as supporting the right to a lien, although there are a number of separate and distinct contracts.

Section 5217 of the Laws of Connecticut, provides as follows:

306    SUMMIT COUNTY COMMON PLEAS.

Ulmer et al v. Portage Construction Co. et al. [Vol. 26 (N.S.)

"If any person shall have a claim for more than $10 for materials furnished or services rendered in the construction," etc., "of a building or its appurtenances, and such claim shall be by virtue of an agreement with, or by the consent of the owner of the land upon which such building with the land on which it stands, shall be subject to the payment of such claim."

This is the statute which the court was construing. It will be noticed that, under this statute, if one does work by consent of the owner, whether there be one or a dozen contracts, he is given a lien. The court construed the statute, on page 507 of the same report, in the following language:

"It is noticeable that the statute does not say that the claim must arise under one contract or from operations on one building. Under the terms of the statute, as we construe it, the claim which is the basis of the lien may arise under one contract or more than one contract."

But under the statute of Ohio, it is required that the labor performed or material furnished be under one general contract. Not by any stretch of the imagination can it be said that the Kinnear-Russell Plumbing & Heating Company did its work under one general contract.

The decision in *Parsons* v. *Keeney, supra,* was arrived at for two reasons. First: That the statute provides for a lien if the work is done or materials furnished by consent of the owner, whether there be one contract or more than one. Second: That the farm and these buildings were a unit, and operated as such. This brings the farm and its buildings within the third class of our General Code, Section 8316.

However, under different conditions, the supreme court of Connecticut came to the contrary conclusion. In the case of *Wilcox* v. *Woodruff,* 29 Am. State Reports, 222, in construing the then statute, which is like our General Code, 8310, the court held that there must be either unity of structure or unity of use, in order that but one affidavit need be filed, and that was necessary even though in the case under consideration there was one general contract.

In that case, the plaintiff furnished lumber to the owner of a lot, for the erection of three separate houses thereon, which were building at the same time, and, when partly finished, were mortgaged separately.   All the lumber was furnished under one contract, and no separate account was kept of how much went into the building of each house. *Held*: that, under general statutes giving the right to mechanic's lien on every building, in the construction of which or any of its appurtenances lienor's claim arose, though plaintiff was entitled to a lien on each house for what lumber went into its construction, he could not have one lien on all the houses for lumber used in the construction thereof.

If there had been either unity of structure or of use, the court would have held the affidavit for a lien good, as it did in the case of *Parsons* v. *Keeney*.

Counsel seems to rely almost entirely on the claim that the Portage Construction Company was constructing these buildings pursuant to a general plan, and that it did not keep separate accounts of the material and labor which went into each building.   But that is not the test of the right of the Kinnear-Russell Plumbing & Heating Company to a lien.   It filed but one affidavit for a lien, so that the test is not what was within the minds of the officers of the Portage Construction Company, but did the Kinnear-Russell Plumbing & Heating Company do its work and furnish its material under one general contract, as it must do to take advantage of Section 8316.

The court finds that the Kinnear-Russell Plumbing & Heating Company's claim for a lien cannot be maintained, either under General Code, Section 8310 or 8316, for the reason that its work was not performed under one general contract.

### CLAIM OF THE BROWN-GRAVES COMPANY.

Harvey L. Graves, the President of the Brown-Graves Company, testified that, in the latter part of January, 1920, Louis Miller, President of the Portage Construction Company, came to Graves' office and said that he was putting

up three buildings on the corner of Twin Oaks Road and Portage Path, and that he wanted prices on lumber and a contract for the material.

The first order of material was given about January 30, 1920 (Brown-Graves' Exhibit 1). On this paper, near the upper end, is the following: "Job Twin Oak and Portage Path." At the bottom appears, "Accepted, 1-30-20. Portage Construction Company, by Louis Miller. Brown-Graves Company by J. B. Brown." Evidently the parties then treated this instrument as more than a mere quotation of prices.

The last flooring referred to in Brown-Graves' Exhibit 1 was delivered about July 11, 1921. The first delivery of material was made in April, 1920.

On the 9th day of March, 1920, the Portage Construction Company gave to the Brown-Graves Company an order for the exterior basement frames for the Twin Oaks building. The whole job, including the three buildings, without distinction, was carried on the books of the Brown-Graves Company as Twin Oaks job. No notice was ever given or request made by the Portage Construction Company that separate accounts be made of materials used in the different buildings. The Portage Construction Company likewise carried but one account on its books for the three buildings.

About June 24, 1920, the Portage Construction Company ordered the finish lumber for the Pasadena building. This order was modified by agreement of both parties, in July, 1921.

The basement frames are not included in Brown-Graves' Exhibit 1. Neither is the finish lumber. Window sash and frames were also ordered later, and which were not included in Brown-Graves' Exhibit 1. Lumber and building material made of lumber were delivered on the order of the Portage Construction Company on many different dates between January, 1920, and August, 1921.

Louis Miller denies stating to Graves, in January, 1920, that he was intending to build three buildings, and that he wanted prices and a contract for the material. Miller

says that he had such a conversation with Graves in April, 1920. Miller's construction of what he did in April, 1920, is, in his own language, that he and the Brown-Graves Company amended the contract of January 30, 1920. The parties could of course, amend the contract, as Miller claims was done, by supplementing or enlarging it. At that time, there was added to the contract of January 30, 1920, the following:

"April 29, 1920. We have entered your order for two buildings of the above job at the above prices, plus $2 per M advance over the above prices. No flooring included. Brown-Graves-Vincent Company per J. B. Brown, Treas."

When, in this memorandum, the words, "two buildings of the above job" were used, that seems to indicate that both parties considered the three buildings as one job.

Miller gave as his reason for denying that he told Graves in January that he was about to put up three buildings, the fact that he was not certain of getting the necessary money from the Cleveland Discount Company until the latter part of April, 1920, and that he did not intend or decide to put up three buildings until after he was assured of the money by the Cleveland Discount Company.

After all, the question is not particularly what may have been in Miller's mind, but what did he say to Graves. Miller's testimony as to the intentions of the Portage Construction Company is contradicted and refuted by the records of the Portage Construction Company. Under date of February 14, 1920, it appears in the corporate records of the Portage Construction Company that Mr. Louis Miller, its President, reported that he had negotiated with Mr. Charles Herberich with reference to the purchase of the tract of land located on Twin Oaks Road, and that the terms "laid down" by the Portage Construction Company, at their last board meeting, were acceptable to Mr. Herberich, and further, that he had entered into a sales agreement, upon the terms and conditions "laid down" at the last meeting. A resolution was also passed, authorizing the president and secretary to sign and execute on behalf of the company notes and all other documents necessary to

310    SUMMIT COUNTY COMMON PLEAS.

Ulmer et al v. Portage Construction Co. et al. [Vol. 26 (N.S.)

the proper execution of the purchase of this real estate, by which is meant the whole tract.

The intent and purpose of the company at that time is expressed in a preamble to another resolution, in the following language:

"And whereas, it is the intent and purpose that this land be used for the erection of three large apartment buildings."

In the record of the meeting of the directors of the Portage Construction Company, on May 1, 1920, there appears a recital preceding the resolution, in the following language:

"Whereas the company is now erecting three apartment buildings on Twin Oaks Road and North Portage Path."

In the same record, on the same date, these apartments are referred to as "our Twin Oaks apartments."

So that the Portage Construction Company intended to acquire the whole tract and erect three large apartment buildings, at least more than ten weeks before the memorandum agreement of April 29 was added to the original contract, Discount Company's Exhibit 69.

The court finds the fact to be that Miller did state to Graves, in January, 1920, that he was about to put up three buildings at Twin Oaks Road and Portage Path; that he wanted prices on lumber and a contract for material for these three buildings. The Brown-Graves Company then quoted prices on some sizes of lumber, and agreed to furnish lumber on the order and specifications of the Portage Construction Company. Thereafter, many orders and specifications for material were given the Brown-Graves Company, some of which included material in Brown-Graves' Exhibit 1, which was the original contract, and some was not. But all the material was used in the buildings. Some orders related to but one building, such as the finish for Pasadena building. In some cases, where the material ordered was not included in the original agreement, such as the finish for the Pasadena, the prices were agreed upon before it was furnished.

The Brown-Graves Company filed its affidavit for a lien on September 7, 1921, within sixty days after it furnished the last material on the job, and no objection appears to the form of the lien affidavit. A copy was duly served, within thirty days, as required by law.

Since there are three separate buildings and but one affidavit, the claimant must bring itself within the provisions of General Code, 8316, before it may be said that a lien was perfected by filing one affidavit.

The first test to be applied, is: did the Brown-Graves Company furnish material under one general contract, or were there several distinct contracts, as claimed by the receiver of the Portage Construction Company and the Cleveland Discount Company.

The term "one general contract" as used in General Code, 8316, does not mean necessarily one entire contract. As already stated, under Section 7249 of the laws of Missouri of 1919, which is essentially like our G. C., 8316, the court, in *Bulger* v. *Robertson,* 50 Mo. App., 503, held that one general contract is one that is not confined to any single or definite building, but relates to all the buildings.

What was done in the case at bar was essentially the following: the Brown-Graves Company agreed, in January, 1920, to furnish such lumber for the three buildings as would be ordered, from time to time, by the Portage Construction Company. Thereafter every order given, delivery made, and price agreement entered into, was pursuant to the original agreement of January, 1920.

What was done differs from what is usually done in several particulars. Usually, a builder goes to a lumber man with a definite bill of materials, but in this case, Miller had no such bill of materials, in January, 1920, nor does it appear that he ever had thereafter. Prices of materials were advancing, and the Portage Construction Company was evidently anxious to make a contract that would in some measure protect it against increased prices. So far as the quantity and sizes were concerned, the contract was, by mutual agreement, left to be made definite by such orders and specifications as would later be given

312    SUMMIT COUNTY COMMON PLEA

Ulmer et al v. Portage Construction Co. et al. [Vol. 23 (N.S.)

the Brown-Graves Company by the Portage Construction Company.

In the case of *Gruner & Brothers* v. *Jones et al.*, 71 Mo. App., 110, the court says:

"The words, 'one general contract' in Section 6729, Revised Statutes, 1889, are not restricted to the contractor for the erection of buildings or making of improvements, but include a material man who makes a general contract to purchase all the material or all of a specified kind, for the buildings or improvements."

So that it appears that. a material man, as well as a contractor, may take advantage of General Code, 8316.

In the case of *Deardorf* v. *Roy et al.*, 50 Mo. App., on page 74, the court states the law, as follows:

"The words, 'erected under one general contract' are not to be confined to a case where the owner may contract for the completion of the buildings in one general contract. In such case, the contractor could, of course, have one lien against all the buildings. So, too, could anyone furnishing. material to such contractor, for all the buildings, have his lien against all, notwithstanding the material so furnished may only partly contribute to the erection of the buildings, and so, too, those words will include a case like the one at bar, where the entire building is not let to a contractor, but where the lineor furnishes to the owner, for all the buildings, material which goes into such erection, notwithstanding such material may compose only a part of such erection."

On page 73, speaking of the Missouri statute, the court says:

"It applies as well to a case where the owner erects his own houses, as where he may let the contract to another."

So that, not only may the material man take advantage of Section 8316, when he has one general contract, but he may do so when, as in this case, the owner erects the buildings, himself, and there is no one general contractor.

In the case of *Flannigan Brothers* v. *O'Connell et al.*, 88 Mo. App., on page 1, the court states the law as follows:

"Where separate buildings are constructed on contiguous lots, under one contract, the lienor need file only one lien."

In the case of *Choteau et al* v. *Thompson,* 2 O. S., 126, which has already been cited, the court makes the particular purpose for which the material was furnished, a test, and finds that, if the materials are furnished, from time to time, for one particular purpose, as on account, but not strictly under one entire contract, the material man has a lien for his materials.

In the case at bar, the particular purpose announced by Miller was the construction of three buildings at the corner of Twin Oaks Road and Portage Path, for which particular purpose the Brown-Graves Company agreed to furnish material. Even though Miller's idea be correct, that as he says, he and the Brown-Graves Company put an amendment to the contract, that could be done, and there would then be one general contract for three buildings, beginning with April 29, 1920, and including what had been delivered before. Miller does not and did not believe that he was making a second or separate contract on April 29, 1920, neither did the Brown-Graves Company.

As supporting the conclusion that a contract may be so enlarged or supplemented, see the opinion of the court in *Lumber Company* v. *Nelson et al.,* 71 Mo. App., at pages 119 and 120.

But it is not necessary to adopt that view of the case. This court holds that where the owner informed the material man that he wished to erect three buildings on a certain tract of land; that he wanted prices and a contract for material, and the material man began to furnish material for the erection of the buildings, without any agreement as to the amount of the material or the duration of his employment, but under a reasonable expectation and belief, induced by the owner, that further material would be ordered of him, to construct the buildings, and he is afterward called upon, from time to time, to furnish material until the buildings are completed, in such situation, the material man is furnishing material under one gen-

eral contract, within the terms of G. C., 8316, and he is entitled to a lien as though acting under a complete original general contract for the entire amount of the materials so furnished.

Not only does such a construction of the law appear to be correct, but a narrower construction would make it practically impossible for a material man, in such a situation, to protect himself. If a narrower construction is adopted in the case at bar, then how many affidavits must be filed by the Brown-Graves Company? The court will not attempt to answer that question. The court finds that the Brown-Graves Company is entitled to a lien against the owner.

This conclusion is supported, if support be necessary, by the language of the court in *Choteau et al.* v. *Thompson*, 2 O. S., 126, *supra*, and more particularly by the reasoning of the court in *Hazard Powder Company* v. *Loomis & Campbell*, 2 Disney, page 544. The latter is an excellently reasoned case. In that case, the court announces the law to be as follows:

"Where a builder or material man has begun to furnish work or materials toward the erection or repair of a building, without any agreement as to the amount of material or duration of his employment, but under a reasonable expectation that further work or material will be required of him to finish the undertaking, and he is afterward called upon, from time to time, to furnish the same, until the building is completed, he is entitled to his lien, as though acting under an original contract for the entire labor or material so furnished."

The court wishes to commend this case to the study of counsel, on account of the unusual merit of the opinion contained in it.

The next question to be determined is whether it is also entitled to a lien as against the mortgages executed on May 10, 1920, and thereafter, which intervened while material was being furnished under this unusual continuing contract.

The court finds that the lien of the Brown-Graves Company attached before the mortgages were filed, and that,

as a consequence, the mortgages given on May 10, 1920, .were construction mortgages, under General Code, Section 8321-1. In that situation, the mortgages are superior to the lien, only to the extent that the Cleveland Discount Company paid out according to the terms of G. C., 8321-1, and inferior to the lien of the Brown-Graves Company to the extent that it paid out in violation of its terms.

The mortgage holders insist that when their agents came to Akron, on May 10, 1920, to take mortgages on the three parcels making up the tract in question, all they had to do was to look at the ground where the Pasadena and Mayfield apartments were placed, and that if no improvements had yet been begun on those particular parcels known as Numbers 2 and 3 in the petition, their mortgages would be ordinary mortgages and not subject to the provisions of G. C., Section 8321-1, also that such mortgages would be prior to any claim for a mechanic's lien on those two buildings.

It is conceded that the Twin Oaks apartment was begun before May 10, 1920, and that, as to it, the mortgage on Parcel Number 1 is a construction mortgage, subject to the provisions of General Code, Section 8321-1.

The court finds that the Mayfield apartment was begun a few days after May 10, 1920, and that the Pasadena was begun two or three weeks later.

The court also finds that the lien of the Brown-Graves Company attached to the owner's interest in the entire tract, in April, when it furnished the first material on the job, for its entire claim, subject, only, to its completing the furnishing of material, under its agreement, and to the taking of the necessary steps to perfect its lien.

The fact that, later, on May 10, the owner gave three mortgages to the Cleveland Discount Company, on this tract, divided into three parcels, does not change the rights of the Brown-Graves Company, and does not operate to require the Brown-Graves Company to split its claim and file a separate affidavit for a lien on each building. Especially is this true since the Brown-Graves Company was at no time notified of the giving of these three mort-

316    SUMMIT COUNTY COMMON PLEAS.

Ulmer et al v. Portage Construction Co. et al. [Vol. 26 (N.S.)

gages and the attempted division of the tract into three parcels. The filing of the mortgage took place after the lien attached, and therefore was not notice to the Brown-Graves Company. It was under no obligation to search the record of title after its lien attached. As between it and the owner, the tract was, and continued to be, one tract, and the contract continued to be one general contract. As between the Brown-Graves Company and the mortgagees, it was necessary for the mortgagees, if they wished to protect themselves, to ascertain not only what appeared on the ground, but also whether or not the owner had made any general contracts relating to the three buildings. It must be assumed that the mortgagees knew of the existence and terms of G. C., Section 8316, as well as G. C., Section 8310.

The court therefore finds that the fact that the mortgagees took three mortgages on the tract, in the form of three parcels, does not invalidate the lein of the Brown-Graves Company.

An interesting case on this subject, though not in all essentials similar is that of *Batchelder* v. *Rand et al.*, 117 Mass., at page 176, in which the court announces the law as follows:

"Where labor is performed and materials furnished, under an entire contract for a round sum, in the construction of two houses situated upon one parcel of land, a lien attaches upon the whole estate, and the facts that the land was conveyed to the owner in separate lots and so designated upon a plan, that one parcel was on one street and the other on another street, being contiguous in the rear, that the buildings were separate, one on each parcel, and that after the contract was made the different parcels were conveyed in mortgage to different persons, are immaterial."

## CLAIM OF THE HERBERICH REALTY COMPANY.

The court finds that the Herberich Realty Company is entitled to a judgment on its note set out in the first cause of action in its cross-petition, in the sum of $42,507.75, with interest as claimed, and that to secure the payment

of that amount it has a mortgage lien on the tract of real estate named in the petition as Parcels 1, 2 and 3.

On account of the fact that, under General Code, Section 8310, the lien of a mechanic or material man attaches only to such interest as the owner who contracts for the construction of a building may have in the real estate, and the further fact that the amount due the Herberich Realty Company is for the unpaid part of the purchase price, the lien of the Herberich Realty Company is superior to that of the Brown-Graves Company.

On account of the waivers of lien executed by the Herberich Realty Company, its lien on Parcel Number 1 is inferior to that of the two mortgages conveying said parcel, which mortgages were executed after May 10, 1920, namely, that to Charles J. Forbes, Trustee, securing the payment of $250,000, and that to the Cleveland Discount Company, securing the payment of $185,566.67. The lien of the Herberich Realty Company on Parcels Number 2 and 3 is inferior to those of the mortgages given on those parcels to the Cleveland Discount Company on May 10, 1920.

## CLAIM OF CHARLES J. FORBES, TRUSTEE.

Charles J. Forbes, as Trustee, is entitled to judgment on his cross-petition, for the amount appearing due, with interest as claimed, and a lien on Parcel Number 1, by virtue of the mortgage held by him, securing the payment of the claim, said claim being for $250,000 and interest.

## CLAIM OF THE MIDLAND BANK, TRUSTEE.

The Midland Bank, as Trustee, is entitled to judgment on its first cause of action in its cross-petition, for the amount appearing due thereon, with interest as claimed, and a lien on Parcel Number 3, by virtue of the mortgage held by it, securing said claim, the claim being for $335,-000 and interest. It is also entitled to a judgment on its second cause of action, for the amount appearing due thereon, with interest as claimed, and a first lien on Par-

**318    SUMMIT COUNTY COMMON PLEAS.**

Ulmer et al v. Portage Construction Co. et al. [Vol. 26 (N.S.)

cel Number 5, to secure the payment of said claim, said claim being for $90,000 and interest.

### CLAIM OF THE CLEVELAND DISCOUNT COMPANY.

The receivers of the Cleveland Discount Company are entitled to a judgment for $95,000, and interest as claimed, by reason of the Receivers' certificates held by them, as set forth in their cross-petition, and a first lien on Parcels Number 2 and 3, as described in the petition, to secure the payment thereof.

As such receivers, they are also entitled to judgment on the fifth cause of action of their cross-petition, for the sum of $60,000 and interest as claimed, and have the first lien on Parcel Number 4, to secure the payment thereof, by virtue of the mortgage held by them to secure said claim.

Said receivers are also entitled to judgment on their fourth cause of action in their cross-petition, for $30,000 and interest as claimed, and to a first lien on Parcel Number 6 for the payment of said judgment.

On the first cause of action of their cross-petition, said receivers are entitled to a judgment for the amount appearing due thereon, with interest as claimed, and a lien to secure the payment of said judgment, on Parcel Number 1, said claim being for $185,566.67 and interest.

Said receivers are entitled to a judgment on the third cause of action of their cross-petition, for the amount appearing due thereon and interest as claimed, and a lien on Parcel Number 2, to secure the payment thereof, said claim being for $200,000 and interest.

### PRIORITY.

For the purpose of determining the priority of liens on Parcels Number 1, 2 and 3, between the Brown-Graves Company and the mortgage holders, namely, the Cleveland Discount Company, Charles J. Forbes, Trustee, and the Midland Bank, Trustee, it is necessary to determine how much of the mortgage funds were paid out by the Cleve-

land Discount Company pursuant to the provisions of General Code, Sec. 8321-1.

The payment of the mortgage fund is governed by Sub-Sections 1, 3, 4, 5, 6 and 7. No claim is made for any payment or withholding of money under Sub-Section 1.

No written notices were filed with the mortgagee, as provided in Paragraph 2 of the Act. So that no claim can be made of payment under Sub-Sections 4 and 5.

Sub-Section Number 7 applies only after the improvement is completed, so that no claim of payment can be urged under that section.

It does not appear that the owner ever ordered the mortgagee to make payments to laborers and material men, during the course of construction, or that the mortgagee ever made such payments directly to material men or laborers, as provided in Sub-Section Number 6. So that it cannot be claimed that any payments made were authorized by that sub-section.

Attention has already been directed to the fact that the Act makes no provision for the payment of any money by the mortgagee to the contractors and sub-contractors, and therefore no claims of payment made during the course of construction to contractors and sub-contractors can be justified under this section.

We have left Sub-Section Number 3, which provides:

"Such mortgagee may, from time to time, pay out on the owner's order directly to contractors or sub-contractors, or to the owner, himself, if he is his own contractor, such sums as said owner may certify to be necessary to meet and pay labor pay rolls for said improvement."

The owner must do two things, namely: he must order the payment and he must certify that the sums ordered paid are necessary to meet and pay labor pay rolls for said improvement. Manifestly, this does not include reimbursing the owner and contractors for sums already paid by them on their labor pay roll.

The Portage Construction Company sold stock, and the money received presumably went into its treasury and was

320 SUMMIT COUNTY COMMON PLEAS.

Ulmer et al v. Portage Construction Co. et al. [Vol. 26 (N.S.)

used in constructing the building. Louis Miller testified that he furnished large sums of money to the company, during the course of construction, and that the company had a considerable income from architectural work. He testified that the three buildings cost the company more than a million dollars. The Cleveland Discount Company furnished to the Portage Construction Company less than $800,000, so that several hundred thousand dollars that were used in these buildings came from other sources than the Cleveland Discount Company. Apparently, all the money received by the Portage Construction Company, from every source, including the Cleveland Discount Company, went into the treasury of the Portage Construction Company and was there commingled, so that when the Portage Construction Company made a payment to anyone, it would be impossible to determine whether the money used in making the payment came from the Cleveland Discount Company or from some other source.

The Cleveland Discount Company did not pay the money to laborers, material men, contractors and sub-contractors, but, with a few exceptions, paid all of the money to the Portage Construction Company. It does not appear that the owner or any contractor at any time certified that a certain definite amount would, at a given time, be necessary to meet and pay a labor pay roll, or that the mortgagee ever paid any amount directly to a material man or laborer, on the order of the owner.

The evidence as to how payments came to be made by the Cleveland Discount Company to the Portage Construction Company appears in the testimony of J. L. Hunting, Supervising Engineer for the Cleveland Discount Company. Hunting said his work was to inspect the progress of the buildings and make payments to the owners, on their requests. When asked for details of his procedure, he said: "I would come to Akron, go to the office of the Portage Construction Company, get their file, and check the money of the vouchers that had been paid out previous to my last visit. After that, I would go over their records

with them, to find out how much money they wanted at that time, getting a list from them as to who they wanted to make payments to, and for what.    After that, we would go out to the building site, go over the building and ascertain how much money they had rightfully coming to them, for work done, and if it was sufficient work done, we would issue an authorization or certificate, to pay to the Construction Company that amount of money they asked for. If there was not enough work done, it would be cut down, accordingly."

The Cleveland Discount Company made its payments, from time to time, on the basis of the amount of work done in the buildings, and not on what was. due laborers and material men.    Hunting's statement of what he did is a general statement, and he did not testify as to what he did in connection with any one payment of the Portage Construction Company.    After a payment was made by the Discount Company, Hunting received a report from the Portage Construction Company, showing the payment of money by the Portage Construction Company.    These reports are Cleveland Discount Company's Exhibits 93-a to 93-ff, inclusive.

As an illustration, taking Discount Company's Exhibit 93-1, which is a statement of payments made by the Portage Construction Company toward completion of the apartments, dated November 19, 1920, it shows no payments to laborers or for labor pay roll.    It does show payments made to contractors.    Between November 10 and November 19, the statement shows that the Portage Construction Company made payments on the Mayfield building, of $5,-437.25.    On November 12, Hunting authorized the payment of $24,000 on this building, and it was paid.    On November 19 he authorized the payment of $5,000 more, and it was paid.    Hunting says the reports are the same as the requests for payment, made to him.

Discount Company's Exhibit 93-k shows that on November 10, the Portage Construction Company had paid substantially $29,000 on the Mayfield building, so that the

payments of $29,000 made on November 12 and 19 reimbursed the Portage Construction Company for having made those payments, instead of being an advance for the purpose of making them.

On November 26, the Portage Construction Company reported that it had made payments on this building to the extent of $4,000; and on the same date, Hunting authorized the payment to them of $4,000.

In other cases, an examination of the reports of payments made by the Portage Construction Company, and a comparison with the amounts authorized by Hunting to be paid, and paid, will show that they cannot be harmonized either on the theory that the Cleveland Discount Company was advancing money to meet payments due, or that it was paying on the basis of payments already made by the Portage Construction Company.

Some of the payments shown on Discount Company's Exhibit 93-k are to contractors, some probably to material men, and none to laborers or to labor pay roll.

Another piece of evidence that tends to show that the Cleveland Discount Company was making its payments on the basis of amounts already paid by the Portage Construction Company, is the letter of the Portage Construction Company to the Cleveland Discount Company, Discount Company's Exhibit 93-d, in which the writer says:

"May I ask you, however, to please forward us a check by special delivery, for $30,000, and charge same to the buildings. I feel sure that the paid vouchers I will present to you will cover this amount, if not exceed same."

The Cleveland Discount Company also offers Exhibits 99 to 263, inclusive, to show payments made by it pursuant to G. C., Section 8321-1, said payments being for labor, material and various other items, such as gasoline, polarine, cheese cloth, fan belts, groceries, gold dust, ammonia, Bon Ami, sapolio, Ford oil cups, scrub brushes, spark plugs, and many other items too numerous to mention. But it does not appear that the Portage Construction Company ever certified to the Cleveland Discount Company

how much money would be necessary, at any time, to pay outstanding bills for spark plugs, Gold Dust, labor and material claims.

. In all the hundreds of payment items appearing in Discount Company's Exhibit 93-a to 93-ff, not more than twenty appear to be labor claims. An examination of these items will show that most of them are for work such as landscaping, for which no lien may be had; and as to the remainder, there is no evidence in the record bringing them within the terms of G. C., Sections 8310 and 8311.

The Cleveland Discount Company claims that it could and did make the Portage Construction Company its agent for the making of payments. The court finds that the evidence does not sustain the claim that the Cleveland Discount Company made the Portage Construction Company its agent for making payments.

The evidence does not sustain the claim that the Cleveland Discount Company made its payments in accordance with and pursuant to the plain requirements of G. C., Section 8321-1.

The evidence fails to show that any of the payments made by the Cleveland Discount Company are entitled to priority over the claim of the Brown-Graves Company.

### DISTRIBUTION ORDER.

For the purpose of distribution, it may be assumed that the six parcels involved will not sell for sufficient to pay the secured claims. Distribution will be ordered as follows:

First: Taxes and assessments, if any, against any parcel, must be paid out of the proceeds of the sale of the parcel.

Second: The costs shall be paid.

Third: Out of the proceeds of the sale of Parcels Number 2 and 3, there shall then be paid the amount represented by the certificates issued by the receivers for the completion of the buildings on those parcels.

Fourth: Out of the remaining proceeds of the sale of Parcels Number 1, 2 and 3, there shall then be set aside the amount due the Heberich Realty Company, on its mortgage, which is superior to the lien of the Brown-Graves Company to the extent of the unpaid purchase money, and to that extent, only.

Fifth: The lien of the Brown-Graves Company attaches only to that part of the value or sale price of the premises which is over or above the unpaid part of the purchase price. It never did attach to that part covered by the mortgage of the Herberich Réalty Company. In other words, the lien of the Brown-Graves Company touches only the interest of the Portage Construction Company, the vendee of the Herberich Realty Company. This interest is the value of the tract conveyed by the Herberich Realty Company, including the improvements placed on it by the Portage Construction Company, less the unpaid purchase money. Since it has already been found that no part of the money paid by the Cleveland Discount Company is entitled to a lien prior to that of the Brown-Graves Company, the lien of the Brown-Graves Company shall be paid in full.

Sixth: The remainder of the proceeds of the sale of Parcels Number 1, 2 and 3 shall then be applied to the payment of the mortgages held by the Cleveland Discount Company, Charles J. Forbes, Trustee, and the Midland Bank, as Trustee, as indicated by their respective priorities, concerning which there is no dispute.

Seventh: If the remainder be insufficient to pay said mortgages in full, then the amount set aside as due the Herberich Realty Company shall be applied in payment of said mortgages.

Eighth: The distribution of the proceeds of the sale of Parcels Number 4, 5 and 6 has already been indicated.